# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MATTHEW FOGEL,
        *Plaintiff-Appellant,*

      v.

WESLEY COLLINS, Officer; GRASS
VALLEY POLICE DEPARTMENT;
MICHAEL HOOKER, Officer; JAROD
JOHNSON, Officer; GARY
MCCLAUGHRY, Officer; GREG
MCKENZIE, Officer; JASON PERRY,
Officer,
        *Defendants-Appellees.*

No. 06-15395

D.C. No.
CV-05-00444-
DFL/KJM

OPINION

Appeal from the United States District Court
for the Eastern District of California
David F. Levi, District Judge, Presiding

Argued and Submitted
October 18, 2007—San Francisco, California

Filed June 27, 2008

Before: Melvin Brunetti, William A. Fletcher, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

Stephen A. Munkelt, Nevada City, Nevada, for the appellant.

Gayle K. Tonon, Truckee, California, for the appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

Police officers of the City of Grass Valley, California, arrested plaintiff-appellant Matthew Fogel and impounded his van because of messages painted on the back of the vehicle. Fogel brought suit against Grass Valley and six police officers under 42 U.S.C. § 1983, alleging a violation of his First

Amendment rights. The district court assumed without deciding that Fogel's First Amendment rights had been violated. On that assumption, it granted summary judgment for defendants, holding that the City of Grass Valley had not implemented an unconstitutional policy or custom, and that the police officers were entitled to qualified immunity. We hold rather than assume that Fogel's First Amendment rights were violated. We nevertheless affirm, for the reasons given by the district court.

## I.   Background

On May 25, 2004, Sergeant Michael Hooker of the Grass Valley Police Department received an anonymous phone call about a parked white Volkswagen van. The caller reported that messages written on the van frightened her. Sergeant Hooker located the unattended 1970 van in the lot of an apartment complex. The words "I AM A FUCKING SUICIDE BOMBER COMMUNIST TERRORIST!" were painted in block letters on the back of the van above the rear window. On the rear window was painted "PULL ME OVER! PLEASE, I DARE YA[.]" Below the window in slightly smaller letters was the text "ALLAH PRAISE THE PATRIOT ACT . . . FUCKING *JIHAD* ON THE FIRST AMENDMENT! P.S. W.O.M.D. ON BOARD!" A small American flag was attached to the van below the lettering. The rest of the van was decorated with slogans and paintings that had no political or threatening character.

Sergeant Hooker was able to determine that the van belonged to Matthew Fogel, a 22-year-old resident of Nevada City, a town four miles away from Grass Valley. Hooker concluded that the messages on the van were just "political satire" and returned to the police station after taking digital photographs of the van. Hooker then called his superior, Defendant Captain Jarod Johnson, who was on back-up on-call duty. Hooker read Johnson the words on the van. Johnson disagreed with Hooker's characterization of the writing as

mere satire. Johnson was "quite certain that a criminal act had been committed" and that the van needed to be removed from its location at the apartment lot.

Captain Johnson ordered Sergeant Hooker to "handle this as a bomb threat," citing the high terror alert in the country. Now, based on Johnson's instruction, Hooker "determined that in fact this was not protected speech, but was criminal." Hooker assigned the criminal investigation to Defendant Officer Jason Perry, who contacted the Department of Homeland Security ("DHS") and the Federal Bureau of Investigation ("FBI"). Perry soon learned that Fogel had no criminal history.

Sergeant Hooker returned to the van, joined by Officer Perry and defendant Officers Wesley Collins, Gary McClaughry, and Greg McKenzie. Hooker and Perry found Fogel fairly easily in an apartment in the complex with friends. Hooker and Perry asked Fogel about the van, and Fogel said that he had painted the messages earlier that day. Hooker, Perry and Fogel then walked out to the parking lot.

Officer Perry asked Fogel to explain the messages on the back of the van. There is some dispute about Fogel's response. The officers contend that Fogel stated he wanted to "scare people," and then stated that he wanted to "scare people into thinking." The officers contend further that Fogel said that he wanted to "terrorize the people of Nevada County like the Iraqi people are being terrorized by the U.S. military." Fogel denies making these statements. Despite these purported statements, Sergeant Hooker found Fogel to be "mild mannered," and Officer McKenzie stated in his deposition that he "personally didn't take [the writing] as a threat" and "[t]he context was not threatening" to him.

Fogel assured the officers that there was no bomb and he encouraged them to search the van. The search revealed no bomb, or indeed anything illegal, in the van. Although Cap-

tain Johnson had directed Sergeant Hooker to treat the situation as a bomb threat, the officers did not follow the Grass Valley Police Department's standard bomb threat procedures at the scene or during their search of the van.

While they were in the parking lot with Fogel, Officer Perry received word from DHS that the agency was "familiar with Fogel . . . as being a local anti government type of person" who was considered a "local nut." Perry then arrested Fogel for violation of California Penal Code § 422 for "willfully threaten[ing] to commit a crime which will result in death or great bodily injury to another person"; § 148.1 for a "false report of secretion of explosive or facsimile bomb"; and § 415 for the "use[ ] of offensive words in a public place which are inherently likely to provoke an immediate violent reaction."

Sergeant Hooker called a private towing company to impound the van. He instructed the company not to release the van until Fogel removed or painted over the writing. Fogel was told he would have to remove or paint over the entire message in order to retrieve his vehicle from the impound lot. No one informed the towing company that a bomb might be inside because, according to Hooker, "at that point we did not believe there was one." Fogel was held in the Grass Valley jail overnight. The local District Attorney declined to press charges, and Fogel was released from jail the following morning. Fogel recovered his van later that day after painting over the messages with white paint.

Fogel filed a § 1983 suit for damages against the Grass Valley Police Department and officers Johnson, Hooker, Perry, Collins, McClaughry, and McKenzie in their individual capacities. He challenged his arrest and the seizure of his van, contending that his First, Fourth, and Fourteenth Amendment rights had been violated. He also brought state-law claims for false arrest, assault, and battery.

After discovery, defendants moved for summary judgment, and Fogel cross-moved for partial summary judgment. The district court granted summary judgment to all of the defendants. *Fogel v. Grass Valley Police Dep't*, 415 F. Supp. 2d 1084, 1090 (E.D. Cal. 2006). The court held that there was a genuine issue of disputed fact whether the writing on the van was a true threat and thus unprotected by the First Amendment. *Id.* at 1088. However, for purposes of qualified immunity, the court assumed that the writing was protected by the First Amendment and that the individual officers had violated Fogel's rights under the amendment. *Id.* at 1089. It then held that the individual officers were entitled to qualified immunity. *Id.* It further held that the City of Grass Valley had not acted pursuant to an unconstitutional policy or practice. *Id.* at 1090. Fogel timely appealed the district court's grant of summary judgment to defendants.[1]

## II.  Standard of Review

We review a district court's grant of summary judgment de novo. We draw all legitimate factual inferences in favor of Fogel, the nonmoving party. *Inouye v. Kemna*, 504 F.3d 705, 711 (9th Cir. 2007); *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007).

## III.  Individual Officers

We first address Fogel's claim against the individual police officers. The district court determined that qualified immunity shielded the officers' actions because reasonable officers could have believed the language was not protected by the First Amendment. *Fogel*, 415 F. Supp. 2d at 1089. Police officers performing discretionary functions within the scope of

---

[1]We consider only Fogel's First Amendment claim on appeal. Fogel abandoned any arguments relating to his Fourth Amendment and state-law claims by failing to argue them in his brief. *See Ghahremani v. Gonzales*, 498 F.3d 993, 997 (9th Cir. 2007).

their employment have qualified immunity from civil suit as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

A two-step analysis guides our qualified immunity inquiry. We first ask whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the facts, viewed in this light, show a constitutional violation, the "sequential step is to ask whether the right was clearly established." *Id.*

## A. First Amendment Violation

The district court assumed without deciding that the individual officers violated Fogel's First Amendment rights. We reach that question and hold that the officers did violate his First Amendment rights. Deciding whether political speech is protected political hyperbole or an unprotected true threat can be an issue for a jury, particularly in cases of criminal prosecution. *Melugin v. Hames*, 38 F.3d 1478, 1485 (9th Cir. 1994). However, *Saucier* instructs us, where possible, to rule on the constitutional issue in order "to set forth principles which will become the basis for a holding that a right is clearly established." 533 U.S. at 201; *see id.* at 207 (calling "important" this "instruction to the district courts and courts of appeals"); *cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567 (1995) ("This obligation [to review and rule on the facts] rests upon us simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace . . . .").

[1] It is well-established that the First Amendment protects speech that others might find offensive or even frightening. Speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with the

conditions as they are, or even stirs people to anger. Speech is often provocative and challenging." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). Courts have long recognized that speech may need to be abrasive or upsetting in order to draw attention to the speaker's cause. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982) ("Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases."). We have "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N. Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

**[2]** "The protections afforded by the First Amendment, however, are not absolute." *Virginia v. Black*, 538 U.S. 343, 358 (2003). The Supreme Court has recognized a "true threat" exception to the First Amendment. *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 708 (1969); *see also Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 371-72 (9th Cir. 1996). A true threat is "an expression of an intention to inflict evil, injury, or damage on another" and such speech receives no First Amendment protection. *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1075 (9th Cir. 2002) (en banc) (quotation marks and citation omitted). If the message on Fogel's van was mere political hyperbole, it was protected by the First Amendment. If it was a true threat, it was not.

**[3]** In most cases where courts have found that speech constituted a true threat, the threatening speech was targeted against specific individuals or was communicated directly to the subject of the threat. *See, e.g.*, *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996) (finding a true threat when the defendant sent more than fifty messages to an abortion clinic director, including: "Robert, remember Dr. Gunn. . . . This could happen to you. . . . Whoever sheds man's blood, by man his blood shall be shed."); *United States v. Bellri-*

*chard*, 994 F.2d 1318, 1320-23 (8th Cir. 1993) (finding a true threat when the defendant sent letters to public officials describing violence he hoped they would suffer if they failed to act as he directed).

**[4]** By contrast, speech that can reasonably be characterized as political rhetoric or hyperbole, particularly such speech not directed at specific individuals, is protected. In *Clairborne Hardware*, the Supreme Court held that the statement "If we catch any of you going in any of them racist stores, we're gonna break your damn neck" was protected by the First Amendment. 458 U.S. at 902, 928. We summarized the *Clairborne Hardware* decision in *Planned Parenthood*,

> To the extent there was any intimidating overtone, [the] rhetoric was extemporaneous, surrounded by statements supporting non-violent action, and primarily of the social ostracism sort. No specific individuals were targeted. For all that appears, *"the break your neck" comments were hyperbolic vernacular*. Certainly there was no history that [anyone] associated with the NAACP had broken anyone's neck who did not participate in, or opposed, [the cause].

290 F.3d at 1073-74 (emphasis added).

Even ostensibly threatening statements directed at specific individuals can be protected. For example, we held in *Bauer v. Sampson* that a college professor's statement that "I, for one, have etched the name . . . and others of her ilk on my permanent shit list, a two-ton slate of polished granite which I hope to someday drop in [the new college president's] head" was protected speech. 261 F.3d 775, 780, 783-84 (9th Cir. 2001); *see also id.* at 783 (calling First Amendment protection for political speech "robust"). The Supreme Court in *Watts* addressed speech that had an even more threatening message if taken literally. There the Court held that the speech of a

Vietnam War protester who stated at a rally that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." was protected. *Watts*, 394 U.S. at 706-708. The statement at issue literally threatened the life of the President, yet the Supreme Court held that the First Amendment protected it as political speech because of the context in which it was spoken.

This circuit has thus far avoided deciding whether to use an objective or subjective standard in determining whether there has been a "true threat." An objective standard asks whether it is "reasonably foreseeable . . . to a speaker that the listener will seriously take his communication as an intent to inflict bodily harm. This suffices to distinguish a 'true threat' from speech that is merely frightening." *Planned Parenthood*, 290 F.3d at 1076. We have also characterized the objective standard as asking "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990); *see also Lovell*, 90 F.3d at 372. The objective standard calls for an examination of the speech in the "light of [its] entire factual context, including the surrounding events and reaction of the listeners." *Orozco-Santillan*, 903 F.2d at 1265; *see also Bellrichard*, 994 F.2d at 1321 (focusing the inquiry on the context of the speech).

This line of cases and the objective standard were called into question by the Supreme Court's statement in *Black* that " '[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," 538 U.S. at 359. Following *Black*, we applied a subjective standard in *United States v. Cassel*, 408 F.3d 622, 633 (9th Cir. 2005). We "conclude[d] that speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." *Id.*

We have since analyzed speech under both an objective and a subjective standard. In *United States v. Stewart*, 420 F.3d 1007, 1015 (9th Cir. 2005), the defendant stated that "he wanted to target a judge and 'string the motherfucker up and cut her throat, his throat, and make it like a copycat so that people would do the same thing.' " We found it unnecessary to choose between an objective and subjective standard because the speech constituted a true threat under either standard. *Id.* at 1018-19. As in *Stewart*, it is unnecessary in this case to choose between an objective and subjective standard, for we conclude that Fogel's speech was protected under either standard.

**[5]** We examine the totality of the message on Fogel's van in light of the full context available to someone observing the van. *See Planned Parenthood*, 290 F.3d at 1067; *see also Orozco-Santillan*, 903 F.2d at 1265. Applying the objective standard, we hold that "a reasonable person would [not] foresee that the statement [on the van] would be interpreted by those to whom [Fogel] communicates the statement as a serious expression of intent to harm or assault." *Id*. A reasonable person would expect that an observer of Fogel's van would see an old Volkswagen van covered with artwork, an American flag, and an obviously satiric or hyperbolic political message. The First Amendment and USA PATRIOT Act references are overtly political speech, and reasonable observers would be hard-pressed to believe that an actual suicide bomber would so boldly announce his presence and intentions. The remainder of the van displayed innocuous images and phrases, including some with spiritual meaning, created through the artistic endeavors of Fogel and his friends.

**[6]** When we take into account the entire context of Fogel's statements on the van, it is hard to see how any reasonable observer would have believed the statements were serious expressions of an intent to cause harm. Captain Johnson interpreted the statements on the van as a bomb threat, but when he instructed Sergeant Hooker to treat it in that manner, he

was relying on only a telephone description. That is, Johnson failed to see the speech in the context of the van's full appearance, and the "textual context" of how the speech was communicated is key. *See Bellrichard*, 994 F.2d at 1323.

The actions of the officers who actually saw the van and its message make clear that reasonable people would not have understood — and did not understand — the speech as a true threat. After first viewing the van, Sergeant Hooker interpreted the message as satire until Captain Johnson instructed him to treat it as a crime. The officers at the scene did not follow bomb threat procedures, indicating that they saw no reason to take the message seriously. It makes no difference that the speech, taken literally, may have communicated a threat. *See Watts*, 394 U.S. at 708. Understood in its full context, no reasonable person would have expected that viewers would interpret Fogel's political message as a true threat of serious harm. *See Lovell*, 90 F.3d at 372.

Applying the subjective standard, we hold that Fogel did not intend his statements to threaten serious harm to anyone. In his deposition, he explained that his goal was:

> to express disagreement . . . with the Patriot Act, and I wanted to display the need to express yourself and use your rights, especially when something like the Patriot Act is working to directly take those rights away and let people know that you still want those rights by exercising them. I wanted to express frustration . . . and I figured this was a safe, healthy way to do that.

Fogel also explained how he envisioned others would interpret the van:

> It seemed to me impossible to construe . . . that someone was actually an Islamic extremist with any reason or desire to do harm to anyone. It seemed

pretty plain to me that it's a joke and it's ironic and it's backwards, and that's just to get people to think about how backwards some of our government's reasoning is.

**[7]** There is virtually no evidence that Fogel subjectively intended the speech as a true threat of serious harm. *See Cassel*, 408 F.3d at 633. The officers noted that Fogel was "mild-mannered" and did not have a threatening presence. None of the officers interpreted Fogel's words or actions as threatening. Even Fogel's purported statement in the parking lot that he intended to scare people — to scare them into thinking, or to scare them in the same way the United States government is scaring Iraqi citizens — is consistent with Fogel's contention that he intended his message to be satirical. Fogel's goal of shocking or "scaring" observers of the van into reflecting on political events is exactly the kind of "unpleasantly sharp attack[ ] on government and public officials" the First Amendment welcomes and protects. *See N.Y. Times Co.*, 376 U.S. at 270.

**[8]** We conclude that Fogel's message constituted, at most, somewhat hyperbolic rhetoric on a matter of public concern. The message was not directed toward any particular person and was communicated as a protest against government policy. Fogel wanted to use his First Amendment rights to protest against what he saw as an attack on those very rights.

**[9]** We therefore conclude that the message communicated on Fogel's van was protected by the First Amendment, and that the police officers of Grass Valley violated Fogel's First Amendment rights by arresting him, impounding the van, and requiring him to paint over the message before allowing him to retrieve the van.

## B. Clearly Established

We next address whether the law, as applied to the facts of this case, was clearly established with sufficient clarity at the

time of the incident to permit an award of damages against the individual officers. We agree with the district court that it was not.

[10] Our inquiry focuses on the precise circumstances of a particular case as well as the state of the law at the time of the alleged violation. *Inouye*, 504 F.3d at 712. We engage in an "objective but fact-specific inquiry." *Id.* The standard for qualified immunity is objective. An officer's subjective understanding of the constitutionality of his or her conduct is irrelevant. *Id.*; *see also Harlow*, 457 U.S. at 818. For a legal principle to be clearly established, it is not necessary that "the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Rather, a clearly-established right exists if "in the light of pre-existing law the unlawfulness [is] apparent." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (quoting *Anderson*, 483 U.S. at 640). In other words, there must be some parallel or comparable factual pattern to alert an officer that a series of actions would violate an existing constitutional right, but the facts of already decided cases do not have to match precisely the facts with which an officer is confronted. *See Hydrick v. Hunter*, 500 F.3d 978, 989 (9th Cir. 2007). The matching of fact patterns demands only a level of particularity such " 'that a reasonable official would understand that what he is doing violates th[e] right.' " *Saucier*, 533 U.S. at 202 (quoting *Anderson*, 483 U.S. at 640). "[I]f officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see Coady v. Steil*, 187 F.3d 727, 734 (7th Cir. 1999).

Although we have concluded that the officers violated the First Amendment when they arrested Fogel, impounded his van, and forced him to remove his message, we cannot say that existing precedents would have alerted the police officers that we would find a violation. *See Galvin v. Hay*, 374 F.3d 739, 745-46 (9th Cir. 2004); *see also Clement v. City of Glendale*, 518 F.3d 1090, 1096 (9th Cir. 2008).

**[11]** As the district court pointed out, in no case had a court held on identical or closely comparable facts that the speech was protected by the First Amendment. That is, in May 2004, when the officers acted, there was no reported case in which a person in the post-September 11 environment satirically proclaimed himself or herself to be a terrorist in possession of weapons of mass destruction. We do not, by our invocation of September 11, 2001, suggest that the First Amendment provides less protection than before September 11. Rather, we recognize that what might previously have been understood as relatively harmless talk might, in the immediate aftermath of September 11, have been understood to constitute a real threat.

Fogel cites *Watts* as a case that should have put the officers on notice that they were infringing his First Amendment rights. In *Watts*, the protester's "threat" against President Johnson was uttered at a large political rally and was conditional. *Watts*, 394 U.S. at 707. However, none of the officers involved with Watts took his statements seriously, and his audience also understood his rhetoric as pure hyperbole to make a political point. *See id.* at 707-08.

**[12]** But in this case, at least a portion of Fogel's audience reacted very differently. The caller who alerted the police to the presence of Fogel's van in the parking lot was clearly worried by the language on the van and by the threat that it or its owner might pose. Further, there is evidence that Captain Johnson, and eventually Sergeant Hooker, felt that the van (and its owner) were making a true threat. Sergeant Hooker described his belief that Fogel could be "unstable," and Officer Perry relayed to the other officers the information that the DHS thought that Fogel was a "local nut." The test for qualified immunity is whether *any* reasonable officer would make the constitutional error in question, not whether *a* reasonable person would. We cannot conclude that at the time of the incident, all reasonable officers would have concluded that Fogel's speech was protected by the First Amend-

ment. *See Malley*, 475 U.S. at 341; *see also Egolf v. Witmer*, 421 F. Supp. 2d 858, 860-61, 876-78 (E.D. Pa. 2006) (concluding that qualified immunity protected state police troopers from liability for arresting nearly-nude protesters at a political rally); *Olaniyi v. District of Columbia*, 416 F. Supp. 2d 43, 55 (D.D.C. 2006) (finding that the First Amendment did not protect the plaintiff's "political speech devised in response to the war on terror" (internal quotation marks and citations omitted)).

**[13]** We therefore hold that despite their violation of Fogel's First Amendment rights, qualified immunity protects the individual officers from an award of damages.

## IV.   Municipal Liability

Fogel also challenges the district court's ruling that the Grass Valley Police Department was entitled to summary judgment. *See Fogel*, 415 F. Supp. 2d at 1089-90. A municipality is liable for the violation of constitutional rights if a city officer's conduct is directly attributable to the city's policy or custom. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691-94 (1978). The district court held that Fogel offered no proof of an unconstitutional official policy and failed to show that any of the defendant officers were policymaking officials. *Fogel*, 415 F. Supp. 2d at 1090. We agree.

A municipality cannot be held liable under a respondeat superior theory. *Monell*, 436 U.S. at 691. But liability can attach if the municipality caused a constitutional violation through official policy or custom, even if the constitutional violation occurs only once. *See id.* at 694; *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). For purposes of liability under *Monell*, a "policy" is "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam) (cita-

tion and internal quotation marks omitted; alteration in original). A municipality is also liable if a policymaking official delegates his or her discretionary authority to a subordinate, and the subordinate uses that discretion. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147-48 (9th Cir. 2005); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126-27 (1988).

**[14]** Fogel has provided no evidence that Grass Valley maintained an official policy of suppressing political speech protected by the First Amendment or that any final policymaking official made a decision to violate his rights. Fogel also has not established that any of the officers involved with his arrest were official policymakers with final decision making authority for Grass Valley, or that any official policymaker "either delegated that authority to, or ratified the decision of, a subordinate." *See Ulrich v. City & County of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002); *see also Monell*, 436 U.S. at 694; *Praprotnik*, 485 U.S. at 126-27. His municipal liability claim therefore fails.

## V. Conclusion

We hold that the individual defendants in this case violated Fogel's First Amendment rights by arresting him, impounding his van, and making him paint over his message. We affirm the district court's decision that qualified immunity protects these defendants from a claim for damages. We also affirm the district court's decision that the City of Grass Valley did not violate Fogel's First Amendment rights.

AFFIRMED.