[No. B201721. Second Dist., Div. One. Sept. 9, 2008.]

SHOWING ANIMALS RESPECT AND KINDNESS et al., Plaintiffs and Appellants, v.
CITY OF WEST HOLLYWOOD, Defendant and Respondent.

## Counsel

Bryan W. Pease for Plaintiffs and Appellants.

Michael Jenkins and J. Stephen Lewis for Defendant and Respondent.

## Opinion

**ROTHSCHILD, J.**—The City of West Hollywood bans all "mobile billboard advertising" of any content, at any time, on any street. Plaintiffs, a nonprofit organization and its president, contend that the ban is an unconstitutional interference with their freedom of speech under the United States and California Constitutions. The trial court held that the ban is constitutional. We agree.

## FACTS AND PROCEEDINGS BELOW

The facts are not in dispute.

Plaintiff, Showing Animals Respect and Kindness (SHARK), is a nonprofit organization that campaigns against cruelty to animals. To promote its message, SHARK operates a truck it calls the "Tiger Truck." The truck has four 100-inch video screens mounted on the front, back and sides. The screens depict scenes of animals being injured or killed by humans. Below the screens, LED signs proclaim messages protesting brutality against animals. The truck also broadcasts the cries of animals being abused.

Plaintiff Steve Hindi was operating the Tiger Truck in the City of West Hollywood at approximately 11:45 p.m. when he was stopped by a city code enforcement officer. The officer cited Hindi for violating a city ordinance which makes it "unlawful for any person to conduct, or cause to be conducted, any mobile billboard advertising upon any street or other public place within the city in which the public has the right of travel."

Hindi appealed the citation at an administrative hearing provided by the city. At the hearing, the code enforcement officer testified that he observed the Tiger Truck travelling on Santa Monica Boulevard in West Hollywood. Three video monitors depicted various scenes of animal abuse during bullfights and displayed signs reading "dumpduff.com" and "sharkonline.org." Hindi did not deny operating the Tiger Truck on the streets of West Hollywood. He testified that his purpose was to publicize entertainer Hilary Duff's involvement in bullfights and rodeos and the resulting animal cruelty.

The hearing officer rejected Hindi's contention that the ordinance violated his and SHARK's First Amendment right of free speech and sustained the city's $1,050 fine against Hindi.

SHARK and Hindi filed this action for injunctive and declaratory relief challenging the constitutionality of the mobile billboard ordinance. The trial court concluded that the ordinance was constitutional and granted the city's motion for summary judgment. SHARK and Hindi filed timely appeals from the judgment.

## DISCUSSION

### I. *SPEECH SUBJECT TO THE ORDINANCE*

West Hollywood Municipal Code section 11.44[1] states in relevant part:

"11.44.010 Purpose. [¶] The purpose of this chapter is to eliminate mobile billboard advertising within the city in order to promote the safe movement of vehicular traffic, to reduce air pollution, and to improve the aesthetic appearance of the city."

"11.44.020 General Requirements. [¶] (A) It is unlawful for any person to conduct, or cause to be conducted, any mobile billboard advertising upon any street, or other public place within the city in which the public has the right of travel. [¶] (B) Mobile billboard advertising includes any vehicle, or wheeled conveyance which *carries, conveys, pulls, or transports any sign or billboard* for the *primary purpose of advertising*." (Italics added.)

"11.44.030 Exemptions. [¶] This section shall not apply to: [¶] (1) Any vehicle which displays an advertisement or business identification of its owner, so long as such vehicle is engaged in the usual business or regular work of the owner, and not used merely, mainly or primarily to display advertisements; [¶] (2) Buses; or [¶] (3) Taxicabs."

██ The West Hollywood City Council adopted the ban on mobile billboard advertising based on its findings "that mobile advertising inhibits the safe movement of traffic, contributes to air pollution, and detracts from the overall aesthetics within the city." (West Hollywood Ord. No. 03-669 (2003) § 1.) The city interprets the prohibition in the ordinance as limited to sign-carrying vehicles that drive on the city streets primarily to display advertisements. We agree with that interpretation.

The city concedes that SHARK was engaged in noncommercial speech but maintains its ordinance applies to both commercial and noncommercial speech. SHARK, however, argues that the term "advertising" applies only to commercial speech. We agree with the city that the ordinance applies to both commercial and noncommercial speech.

The term "advertise" is not limited to calling the public's attention to a product or a business. The definition of "advertise" is more general: "to make something known to[;] . . . to make publicly and generally known[;] . . . to

---

[1] Further section references are to the West Hollywood Municipal Code, unless otherwise indicated.

announce publicly *esp[ecially] by a printed notice or a broadcast . . . .*"
(Merriam-Webster's Collegiate Dict. (10th ed. 1995) p. 18, italics added.)
Thus, although the subject of the matter brought to notice may be commercial, it is not necessarily so. Messages endorsing a political candidate, a social cause or a religious belief would also fall within the term "advertise."

Because the term "advertise" is not ambiguous, we need not consider the ordinance's legislative history to ascertain its meaning. (*Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1151 [74 Cal.Rptr.3d 81, 179 P.3d 882].) We note, however, the city council's finding that the ordinance "will not unduly burden commercial advertising within the City" does not support the conclusion that the ordinance was intended to affect only commercial advertising. A more reasonable conclusion is that the finding was intended to assure operators of commercial vehicles such as buses, taxis and delivery trucks that they would not be subject to fines for carrying on their normal activities.

Finally, as we explain below, it is not necessary to construe the ordinance as applying only to commercial speech in order to find it constitutional.[2]

## II. *STANDARDS FOR ANALYZING THE ORDINANCE*

■ The level of scrutiny with which we review an ordinance restricting speech depends on whether the restriction is a content-neutral regulation of the time, place or manner of the speech or whether it is a restriction on the content of the speech itself. Content-neutral restrictions are reviewed to determine whether they serve a significant government interest, are narrowly tailored to that interest and leave open alternative avenues of communication. (*Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 865 [69 Cal.Rptr.3d 288, 172 P.3d 742]; see *United Brotherhood of Carpenters and Joiners of America Local 848 v. National Labor Relations Bd.* (9th Cir. 2008) 540 F.3d 957, 963 (hereafter *Carpenters*).) Content-based restrictions, on the other hand, are strictly scrutinized to determine whether they are " 'necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end.' " (*Fashion Valley Mall, supra,* 42 Cal.4th at p. 869; see *Carpenters, supra,* 540 F.3d at p. 963.) Furthermore, under *Metromedia, Inc. v. San Diego* (1981) 453 U.S. 490, 513 [69 L.Ed.2d 800, 101 S.Ct. 2882]

---

[2] In *Supersign of Boca Raton v. City of Fort Lauderdale* (11th Cir. 1985) 766 F.2d 1528, the court held an ordinance similar to West Hollywood's did not unconstitutionally interfere with the plaintiff's commercial speech. The court did not construe the ordinance as limited to commercial speech in order to find it constitutional, however. It merely accepted the parties' agreement that the ordinance only applied to commercial speech. (*Id.* at p. 1530, fn. 1.)

(plur. opn. of White, J.), an ordinance is generally invalid if it imposes greater restrictions on noncommercial speech than on commercial speech.

The distinction between restrictions that are content neutral and those that are content based has been recognized in cases involving vehicles driven on the public streets for the sole purpose of conveying noncommercial messages. If the restriction is limited to the manner of the speech it will generally be upheld. If, on the other hand, the restriction is aimed at the content of the speech it will generally be declared unconstitutional.[3] The following cases are illustrative.

In *Kovacs v. Cooper* (1949) 336 U.S. 77 [93 L.Ed. 513, 69 S.Ct. 448], police in Trenton, New Jersey, arrested Kovacs for using a sound truck to comment on a labor dispute then in progress in the city. The police charged Kovacs with violating a Trenton ordinance banning " 'any device known as a sound truck . . . which emits therefrom loud and raucous noises . . . .' " (*Id.* at p. 78.) The court upheld the constitutionality of the ordinance, concluding it constituted a content-neutral effort to prevent "nuisances well within the municipality's power to control." (*Id.* at pp. 82–83.)

In *Center for Bio-Ethical v. Los Angeles County* (9th Cir. 2008) 533 F.3d 780, sheriff's deputies, acting under color of Penal Code section 626.8, ordered the plaintiff organization, its employees and volunteers to stop driving a truck that displayed enlarged, graphic photographs of early-term aborted fetuses around the perimeter of a California middle school. The statute made it a misdemeanor for a person to come onto a "street, sidewalk, or public way" adjacent to a school if the person's "presence or acts interfere with the peaceful conduct of the activities of the school or disrupt the school or its pupils or school activities . . . ." (§ 626.8, subd. (a).) The court held that if the statute "would allow or disallow speech depending on the reaction of the audience, then [it] would run afoul of an independent species of prohibitions on content-restrictive regulations . . . ." (533 F.3d at p. 787.) If, on the

---

[3] Of course, not all content-based restrictions on noncommercial speech violate the First Amendment. In *Fogel v. Collins* (9th Cir. 2008) 531 F.3d 824, the Green Valley police arrested Fogel for driving a van bearing a number of slogans including " 'I AM A FUCKING SUICIDE BOMBER COMMUNIST TERRORIST' " and " 'W.O.M.D. [Weapon Of Mass Destruction] ON BOARD!' " (*Id.* at p. 827.) The police charged Fogel with violating California Penal Code sections that prohibit willful threats to commit a crime, making false bomb reports and using words likely to provoke an immediate violent reaction. The district attorney declined to press charges and Fogel was released the next morning. In Fogel's civil rights suit against the city and the arresting officers the court recognized that a state statute punishing a " 'true threat' " does not violate the First Amendment but a statute punishing mere "political hyperbole" does. (531 F.3d at p. 830.)

other hand, the statute "applies only to disruptions caused by the *manner* and not the *content* of speech, our First Amendment concerns are resolved." (*Id.* at p. 790, original italics.) The court concluded, "California courts would construe § 626.8 to apply to speech only when the disruption caused by the speaker is caused by the *manner* of the speech." (*Id.* at p. 793, original italics.)[4]

SHARK argues that West Hollywood's mobile billboard ordinance is content based, and therefore subject to strict scrutiny, because section 11.44.030, subd. (1) favors commercial speech over noncommercial speech by exempting "[a]ny vehicle which displays an advertisement or business identification of its owner." We do not agree that the ordinance is content based.

The full text of section 11.44.030, subd. (1) states that the ordinance "shall not apply to . . . [¶] . . . [a]ny vehicle which displays an advertisement or business identification of its owner, *so long as such vehicle is* engaged in the usual business or regular work of the owner, and *not used merely, mainly or primarily to display advertisements.*" (Italics added.) The business identification provision is not an "exemption" in the sense that a vehicle displaying an advertisement of its owner would otherwise violate the ordinance. Under the definition of "mobile billboard advertising," Joe, a landscaper, would not violate the ordinance if he drove a truck bearing the sign "Joe's Landscaping" on West Hollywood streets on his way to a landscaping job. Joe would violate the ordinance, however, if he drove the truck on West Hollywood streets "for the primary purpose of advertising." (§ 11.44.020, subd. B.) Thus, the business identification provision is consistent with, rather than an exception to, the ordinance's definition of mobile billboard advertising. Under the provision, a vehicle bearing an advertisement or business identification of its owner does not violate the ordinance. But the vehicle does violate the

---

[4] In addition to these cases involving signs on vehicles there is a legion of cases upholding content-neutral restrictions on signs themselves including signs displaying animated electronic messages (*Naser Jewelers, Inc. v. City of Concord, N.H.* (1st Cir. 2008) 513 F.3d 27, 32–34); signs with movable displays (*Advantage Media, L.L.C. v. City of Eden Prarie* (8th Cir. 2006) 456 F.3d 793, 797–798); signs that flash and blink (*La Tour v. City of Fayetteville, Ark.* (8th Cir. 2006) 442 F.3d 1094, 1096); and signs that revolve, rotate or display motion (*State v. Dahl* (Minn.Ct.App. 2004) 676 N.W.2d 305, 309). Cases striking down content-based restrictions on signs include *Metromedia, Inc. v. City of San Diego, supra,* 453 U.S. at pages 513, 516 (ordinance held content based restriction because it treated commercial speech more favorably than noncommercial speech) and *National Advertising Co. v. City of Orange* (9th Cir. 1988) 861 F.2d 246, 248 (ordinance content based because "noncommercial signs are exempted or prohibited [depending] on whether or not they convey messages approved by the ordinance" (fn. omitted)).

ordinance if the vehicle is driven "merely, mainly or primarily to display advertisements." The purpose of section 11.44.030 is to make it clear that the ordinance does not apply to ambulances, delivery vans, catering trucks and other commercial vehicles going about their "usual business" in the city.

Taken together, sections 11.44.020 and 11.44.030 apply to all vehicles whether they carry a commercial or noncommercial message (e.g., support for a particular candidate for office) because both are prohibited from driving through the streets of West Hollywood for the primary purpose of advertising. As we discuss below, the purpose of the ordinance serves a significant government interest, as SHARK concedes. Likewise, the ordinance is narrowly tailored to achieve that interest.

Our view that the ordinance regulates the manner of speech, not its content, is further supported by the language that the city used to express its prohibition on mobile billboard advertising. It defined "mobile billboard advertising" as "any vehicle, or wheeled conveyance which carries, conveys, pulls, or transports any sign or billboard . . . ." (§ 11.44.020, subd. B.) The words "carries," "conveys," "pulls," and "transports" are active verbs showing that the ordinance is concerned with the speaker's acts, not the content of the speech. (Cf. *Center for Bio-Ethical Reform v. Los Angeles County, supra,* 533 F.3d at pp. 792–793 [active verbs "acts," "interfere[s]," and "disrupt[s]" show that statute regulates speaker's behavior, not the content of the speech].)

We conclude, therefore, that the ordinance is content neutral. It draws no distinctions based on the content of the speech or the viewpoints expressed. (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d 661, 109 S.Ct. 2746].) Nor is there any evidence that "the ordinance was designed to suppress certain ideas that the City finds distasteful or that it has been applied to [plaintiffs] because of the views that they express." (*City Council v. Taxpayers for Vincent* (1984) 466 U.S. 789, 804 [80 L.Ed.2d 772, 104 S.Ct. 2118].) Indeed, counsel for the city told the trial court that the city supports SHARK's message, just not the medium.

### III. *SIGNIFICANT GOVERNMENT INTEREST*

The declared purpose of the ordinance "is to eliminate mobile billboard advertising within the city in order to promote the safe movement of vehicular traffic, to reduce air pollution, and to improve the aesthetic appearance of the city." (§ 11.44.010.)

SHARK agrees that these are legitimate governmental interests. (Cf. *Metromedia, Inc. v. San Diego, supra,* 453 U.S. at pp. 507–508 [traffic safety and city aesthetics are "substantial governmental goals"]; *Huron Cement Co. v.*

*Detroit* (1960) 362 U.S. 440, 442 [4 L.Ed.2d 852, 80 S.Ct. 813] [reducing air pollution "clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power"].)

### IV. *NARROW TAILORING*

SHARK argues that the ordinance is not narrowly tailored to achieving the city's legitimate interests because it exempts buses and taxicabs which also carry billboards.

We disagree with SHARK's interpretation of the ordinance as allowing buses and taxis, but not the Tiger Truck, to roam the city streets for the "primary purpose of advertising." The object of the ordinance is to "eliminate" from city traffic vehicles that have no real purpose apart from advertising. (§ 11.44.010.) Even though buses and taxis may display advertising on their roofs and sides, their "primary purpose" is not advertising but transporting people from one place to another. Buses and taxis would be on the streets whether or not they bore advertising. Thus the ordinance is reasonably calculated to reduce traffic hazards, visual clutter and pollution by banning vehicles that would not be on the streets but for their conveyance of signs or billboards "for the primary purpose of advertising."

██ Under *Ward v. Rock Against Racism*, a restriction on a medium of speech serves a significant government interest if the interests at issue "would be achieved less effectively absent the regulation." (*Ward v. Rock Against Racism, supra*, 491 U.S. at p. 799.) Here, the city's interests in enhancing traffic safety, reducing visual clutter and lessening pollution would be achieved less effectively absent the ban on mobile billboards. Mobile billboards are, typically, signs much larger than appear on the sides of buses and taxis. They are conveyed up and down the city's streets, often on trailers towed behind large trucks. SHARK's Tiger Truck is a classic example of the type of vehicle the city intended to ban from its streets. SHARK's Web site, included in the record, describes its Tiger Truck as a "monster," about which " '[t]here isn't anything subtle.' " Further, " '[t]he cries of animal victims are inescapable[,]' . . . 'the images are horrible, and there's no escaping them . . . .' "[5] The undisputed evidence shows that the Tiger Truck has no purpose other than advertising. Furthermore, its 100-inch video screens, illuminated messages and sound effects are by their very nature hazardous to drivers and detract from "the overall aesthetics within the city" and the truck's engine pollutes the city air. (Cf. *Carpenters, supra*, 540 F.3d at pp. 968–969

---

[5] SHARK's description of its truck on its Web site contradicts its claim on appeal that if people do not like its visual displays they can "look away." The people of West Hollywood who encounter the Tiger Truck are, like the people of Trenton who encountered the sound truck, "practically helpless to escape." (*Kovacs v. Cooper, supra*, 336 U.S. at p. 87.)

[complete ban on wearing or carrying signs at shopping mall burdens substantially more speech than is necessary to further mall's legitimate interest in safety and aesthetics].)

## IV. *ALTERNATIVE CHANNELS FOR COMMUNICATION*

█ It is well established that if a city bans a form of communication the ban must "leave open ample alternative channels for communication." (*Clark v. Community for Creative Non-Violence* (1984) 468 U.S. 288, 293 [82 L.Ed.2d 221, 104 S.Ct. 3065].)

SHARK maintains that "[t]here is no alternate means of communication that comes close to the Tiger Truck in terms of cost efficiency, strength of the message, and visibility." This may be true, but SHARK cites no authority holding that any of these factors are relevant to the constitutionality of the mobile billboard ordinance as applied to the Tiger Truck. Substantial authority exists to the contrary. In *Kovacs v. Cooper* the United States Supreme Court held that the cost efficiency of sound trucks was not a reason to grant them constitutional protection. The court stated: "That more people may be more easily and cheaply reached by sound trucks, perhaps borrowed without cost from some zealous supporter, is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open." (*Kovacs v. Cooper, supra,* 336 U.S. at pp. 88–89.) Nor is it relevant that the Tiger Truck is a unique method of communication able to grab public attention in a way that other media may not. Selling message-bearing raviolis on a street corner would also be a unique method of communication but would not escape a ban on the sale of food and refreshments on city sidewalks. (See *One World One Family v. City and County of Honolulu* (9th Cir. 1996) 76 F.3d 1009, 1011, 1015.) The First Amendment does not guarantee an individual the most effective means of communication, only the means to communicate effectively. (*City Council v. Taxpayers for Vincent, supra,* 466 U.S. at p. 812.)

The city's ban on mobile billboard advertising leaves SHARK with numerous alternative channels for effectively communicating its message. As we previously noted, SHARK already uses one of these channels—the Internet. SHARK offered no explanation why it could not use other methods of communication such as advertising on buses and taxis, flyers, direct mailings, newspaper ads, and speeches in public places.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

Neidorf, J.,[*] concurred.

**MALLANO, P. J.,** Dissenting.—I believe that plaintiffs Showing Animals Respect and Kindness (SHARK) and Steve Hindi did not violate West Hollywood Municipal Code chapter 11.44, which prohibits "mobile billboard advertising," because that chapter bans only commercial speech, and not the kind of noncommercial speech engaged in by plaintiffs, namely making a case against cruelty to animals. (All chapter and section references are to the city's municipal code.) Section 11.44.020, subdivision A makes it unlawful "for any person to conduct, or cause to be conducted, any *mobile billboard advertising* upon any street, or other public place within the city in which the public has the right of travel." (Italics added.) The ordinance then states, "Mobile billboard advertising includes any vehicle, or wheeled conveyance which carries, conveys, pulls, or transports any sign or billboard for the *primary* purpose of advertising." (§ 11.44.020, subd. B, italics added.)

The issue presented is, "What is advertising?" I think of advertising as promoting a product or service—commercial speech—as opposed to promoting a political or social message, such as speaking against cruelty to animals—noncommercial speech. A look at a few dictionaries supports my view. Here are some examples.

The American Heritage Dictionary defines "advertising" as "[t]he activity of attracting public attention to a product or business, as by paid announcements in the print, broadcast, or electronic media." (American Heritage Dict. of the English Language (4th ed. 2000) <http://www.bartleby.com/61/57/A0105700.html> [as of Sept. 9, 2008].) According to Random House Webster's College Dictionary (1992), "advertising" means "to announce or praise (a product, service, etc.) in some public medium of communication in order to induce people to buy or use: *to advertise a new brand of toothpaste.*" (*Id.* at p. 20.) The same dictionary indicates that the definition of "advertising" meaning "to inform or advise" is obsolete. (*Ibid.*)

Webster's Third New International Dictionary (2002) defines "advertising" as "the action of calling something (as a commodity for sale, a service offered or desired) to the attention of the public esp. by means of printed or broadcast paid announcements." (*Id.* at p. 31.) The Compact Oxford English Dictionary

---

[*]Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

states that "advertising" is a derivative of "advertise," which means "[to] present or describe (a product, service, or event) in a public medium so as to promote sales." (Compact Oxford English Dict. (2005) <http://www. askoxford.com/concise_oed/advertise?view=uk> [as of Sept. 9, 2008].)

The likelihood that the ordinance governs only commercial speech is also suggested in that "advertising" is preceded by "billboard." The ordinance does not regulate simply "advertising" but "billboard advertising." A "billboard" is "a very large board on which advertisements are shown, esp. at the side of a road." (Cambridge Dict. of American English (2d ed. 2007) <http://dictionary.cambridge.org/Default.asp?dict=A> [as of Sept. 9, 2008].) "Advertisement," in turn, means "a *paid* notice that tells people about a product or service." (*Ibid.*, italics added.)

On the other hand, the Encarta Online Encyclopedia gives the following definition of "advertising": "a form of commercial mass communication designed to promote the sale of a product or service, *or a message on behalf of an institution, organization, or candidate for political office.*" (Microsoft Encarta Online Encyclopedia (2008) <http://encarta.msn.com/ encyclopedia_761564279/advertising.html> [as of Sept. 9, 2008], italics added.) And the Oxford English Dictionary provides this definition: "A bringing into notice; *spec.* by paid announcement in a printed journal, by prominent display of placards, etc." (Oxford English Dict. (2d ed. 1989) <http://dictionary.oed.com> [as of Sept. 9, 2008].)

I could no doubt search other dictionaries from various times and come up with different definitions. But this case does not turn on which dictionary one uses. Rather, the foregoing definitions illustrate the point that "advertising," as used in the ordinance, is ambiguous with respect to whether it is limited to commercial speech, as plaintiffs contend, or whether it covers both commercial and noncommercial speech, as the city contends. In light of this ambiguity, I look to the legislative history of chapter 11.44 for the answer to that question. (See *Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1151 [74 Cal.Rptr.3d 81, 179 P.3d 882].)

Chapter 11.44 is a part of West Hollywood Ordinance No. 03-669. The preamble states: "The City Council of the City of West Hollywood resolves, determines and orders as follows. Section 1. Findings. [¶] . . . [¶] C. The restrictions contained in the following Ordinance will not unduly burden *commercial advertising* within the City." (Italics added.) This language convinces me that the city intended the ordinance to cover commercial speech only. Otherwise, it could be read as indicating a willingness to unduly burden *noncommercial* speech. In *Supersign of Boca Raton v. City of Fort Lauderdale* (11th Cir. 1985) 766 F.2d 1528, the district court interpreted a

virtually identical ordinance as regulating only commercial speech. (*Id.* at pp. 1529–1530.) Because the court's interpretation was plainly correct, neither side disputed it on appeal. (*Id.* at p. 1530, fn. 1.)

Consistent with the purpose of not unduly burdening commercial speech, the city's ordinance contains an "[e]xemption[]" for "[a]ny vehicle which displays an *advertisement or business identification* of its owner, so long as such vehicle is engaged in the *usual business or regular work* of the owner, and not used merely, mainly or primarily to display advertisements." (§ 11.44.030, italics added.) Buses and taxicabs are completely exempt from the ordinance. (*Ibid.*)

Finally, assuming for the sake of argument that the ordinance covers commercial and noncommercial speech to the same extent, it still raises serious First Amendment issues. "Merely treating noncommercial and commercial speech equally is not constitutionally sufficient. The first amendment affords greater protection to noncommercial than to commercial expression. . . . Regulations valid as to commercial speech may be unconstitutional as to noncommercial. . . . [¶] Thus, '[a]lthough the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests.' " (*National Advertising Co. v. City of Orange* (9th Cir. 1988) 861 F.2d 246, 248, citations omitted.) "[T]he constitution . . . grants 'less protection to commercial speech than to other constitutionally safeguarded forms of expression' " (*Sciarrino v. City of Key West, Fla.* (11th Cir. 1996) 83 F.3d 364, 367; accord, *Ohralik v. Ohio State Bar Assn.* (1978) 436 U.S. 447, 455–456 [56 L.Ed.2d 444, 98 S.Ct. 1912, 1918]), and political speech enjoys the highest level of protection (see *FEC v. Massachusetts Citizens for Life, Inc.* (1986) 479 U.S. 238, 260 [93 L.Ed.2d 539, 107 S.Ct. 616, 629]; *Coral Springs Street Systems v. City of Sunrise* (11th Cir. 2004) 371 F.3d 1320, 1347, fn. 22). Yet, under the city's interpretation, the ordinance prohibits a political organization from using its vehicle for the primary purpose of displaying a sign in support of a particular candidate.

The law is to the contrary. The First Amendment protects the right of a vehicle owner to drive on public streets for the primary purpose of conveying a *noncommercial* message that appears on the vehicle. (See *Center for Bio-Ethical v. Los Angeles County* (9th Cir. 2008) 533 F.3d 780, 783–793 [sheriff's department violated drivers' First Amendment rights by preventing vehicle, which bore enlarged photographs of aborted fetuses, from circling school during morning rush hour notwithstanding officers' concerns about traffic congestion and safety of pedestrians]; *Fogel v. Collins* (9th Cir. 2008)

531 F.3d 824, 827–828, 829–833 [police violated vehicle owner's First Amendment rights by arresting him and impounding his vehicle just because it bore messages saying, " 'I am a fucking suicide bomber communist terrorist,' " " 'Pull me over! Please, I dare ya,' " " 'Allah Praise the Patriot Act,' " and " 'W.O.M.D. on board' " (capitalization omitted)].) The right to display a sign on a vehicle, as exercised by plaintiffs here, rests largely on the principle that " '[a]ll public streets are held in the public trust and are properly considered traditional public fora.' " (*Center for Bio-Ethical*, at p. 787, quoting *Frisby v. Schultz* (1988) 487 U.S. 474, 481 [101 L.Ed.2d 420, 108 S.Ct. 2495, 2500].)

Given that we should accept an interpretation of the ordinance that avoids constitutional doubts regarding its validity, I interpret the ban on "advertising" to pertain to commercial advertising only. (See *Conway v. Pasadena Humane Society* (1996) 45 Cal.App.4th 163, 177 [52 Cal.Rptr.2d 777].) "A statute [that may] imping[e] on the right of free speech should be construed no more broadly than is absolutely necessary to accomplish its purposes." (*Canon v. Justice Court* (1964) 61 Cal.2d 446, 452, fn. 5 [39 Cal.Rptr. 228, 393 P.2d 428]; accord, *Welton v. City of Los Angeles* (1976) 18 Cal.3d 497, 505–506 [134 Cal.Rptr. 668, 556 P.2d 1119].)

I do not suggest that an appropriate ordinance cannot be drafted to remedy the distraction and other traffic problems that might be attributed to the video broadcasts and the sound emitted by plaintiffs' vehicle in this case. (See *Kovacs v. Cooper* (1949) 336 U.S. 77, 86–88, 89, 96–97 [93 L.Ed. 513, 69 S.Ct. 448, 453–454, 455, 458–459] [city ordinance may, consistent with First Amendment, prohibit vehicles from using sound-amplifying devices]; *Naser Jewelers, Inc. v. City of Concord, N.H.* (1st Cir. 2008) 513 F.3d 27 [rejecting First Amendment attack on city ordinance banning all electronic messaging signs, including signs that appear animated or projected]; *Advantage Media, L.L.C. v. City of Eden Prairie* (8th Cir. 2006) 456 F.3d 793, 797–798 [upholding, against First Amendment challenge, ordinance prohibiting signs with movable displays]; *La Tour v. City of Fayetteville, Ark.* (8th Cir. 2006) 442 F.3d 1094, 1095–1100 [First Amendment notwithstanding, city may prohibit all signs that flash or blink]; *State v. Dahl* (Minn.Ct.App. 2004) 676 N.W.2d 305 [affirming defendant's conviction under, and rejecting First Amendment challenge to, city ordinance banning "motion signs"—signs that revolve, rotate, have moving parts, or display motion].) But the First Amendment requires that such an ordinance be drawn with more precision than the one here. (See *Welton v. City of Los Angeles, supra,* 18 Cal.3d at p. 506.) The city's ordinance, as construed by the city, is overbroad.

In sum, chapter 11.44 should be construed to avoid First Amendment concerns. It follows that because Hindi's and SHARK's anticruelty to animals message was noncommercial speech, it did not fall within the ban of chapter 11.44. Thus, I would reverse.

A petition for a rehearing was denied October 6, 2008, and appellants' petition for review by the Supreme Court was denied December 17, 2008, S167583.