Kelvin GANT, Reginald Lenard Smith, Jose Alexander Ventura, individually and as class representatives, Plaintiffs,

v.

COUNTY OF LOS ANGELES, Los Angeles County Sheriff's Department, City of Los Angeles, Los Angeles Police Department, City of Chino, Chino Police Department, County Of San Bernardino, San Bernardino County Sheriff's Department, City of Torrance, Torrance Police Department, Steve Jangaard (# 14509), Rod Irvine (# 12262), and Does 1 through 10, in both their personal and official capacities, Defendants.

Case No. CV 08–5756 GAF (PJWx).

United States District Court, C.D. California.

April 26, 2011.

Donald Webster Cook, Mann and Cook Law Office, Robert Frederick Mann, Mann and Cook, Attorneys at Law, Los Angeles, CA, for Plaintiffs.

Michael D. Allen, Scott E. Caron, Lawrence Beach Allen and Choi PC, Glendale, CA, Craig J. Miller, Wendy C. Shapero, Los Angeles City Attorney's Office, Los Angeles, CA, Peter James Ferguson, Diana Lee Field, Ferguson Praet & Sherman, Santa Ana, CA, James H. Thebeau, San Bernardino County Counsel, San Bernardino, CA, Della D. Thompson–Bell, City of Torrance City Attorneys Office, Torrance, CA, for Defendants.

## MEMORANDUM & ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

GARY ALLEN FEESS, District Judge.

### I.

### INTRODUCTION & BACKGROUND

Plaintiffs Kelvin Gant ("Gant"), Reginald Lenard Smith ("Smith"), and Jose Alexander Ventura ("Ventura") filed this putative class action against the County of Los Angeles, the Los Angeles County Sheriff's Department, the City of Los Angeles, the Los Angeles Police Department, the City of Chino, the Chino Police Department, the County of San Bernardino, the San Bernardino County Sheriff's Department, the City of Torrance, the Torrance Police Department, and Torrance police officers Steve Jangaard and Rod Irvine. (Docket No. 69, Third Am. Class Action Compl. ("TACC").) Plaintiffs allege that Defendants improperly arrested them on warrants issued for other persons or improperly detained them following their improper arrests.

On October 8, 2009, the Court granted in part a motion to dismiss by the County of Los Angeles, the Los Angeles County

Sheriff's Department, the City of Los Angeles, and the Los Angeles Police Department. (Docket No. 94, 10/8/09 Order). The Court later also granted a motion for judgment on the pleadings on Smith's only remaining claim. (*See* Docket No. 108, 2/25/10 Order, 2010 WL 679082.) Thus, only Gant and Ventura remain in this suit. The surviving claims are as follows: Ventura asserts (1) a § 1983 claim for over-detention in violation of his Fourteenth Amendment due process rights against Los Angeles County and the Los Angeles County Sheriff's Department (collectively, the "L.A. County Defendants"), the City of Chino and the Chino Police Department (collectively, the "Chino Defendants"), and the County of San Bernardino and the San Bernardino County Sheriff's Department (collectively, the "San Bernardino Defendants"); (2) a § 1983 claim for unlawful seizure in violation of his Fourth Amendment rights against the Chino Defendants and the San Bernardino Defendants; and (3) a claim for wrongful arrest in violation of the Bane Act, Cal. Civ.Code § 52.1(b), against the Chino Defendants and the San Bernardino Defendants. (TACC ¶¶ 62–64, 68–72, 73–78). Gant asserts (1) a § 1983 claim for unlawful seizure in violation of his Fourth Amendment rights against the City of Torrance, the Torrance Police Department, Jangaard, and Irvine (collectively, the "Torrance Defendants"); (2) a § 1983 claim for over-detention in violation of his Fourteenth Amendment rights against the Torrance Defendants; (3) a claim against the City of Torrance and the Torrance Police Department (collectively, the "Torrance City Defendants") for wrongful arrest in violation of the Bane Act, Cal. Civ.Code § 52.1(b); (4) a claim for false imprisonment against the Torrance City Defendants; and (5) a § 1983 claim for over-detention in violation of his Fourteenth Amendment due process rights against the L.A. County Defendants. (TACC ¶¶ 62–64, 79–82, 83–88.)

The Defendants now move for summary judgment on all these claims. (Docket Nos. 112, 120, 133, 140, 143.)

## II.

## FACTS

### A. WARRANT SYSTEMS

The California Department of Justice ("CDOJ") operates and maintains a Wanted Persons System ("WPS") containing information about warrants issued by courts in the state. Law enforcement agencies can access the WPS when they seek to ascertain whether a specific individual has an outstanding warrant. Warrants can contain a subject's name and date of birth, address, physical descriptors, and various unique identifiers, including social security number and various fingerprint-based identification numbers that are assigned at the local, state, and national levels. For instance, Los Angeles County agencies assign an "L.A. Main" number (Docket No. 126, Declaration of Donald W. Cook ("126 Cook Decl."), Ex. J [Depo. of Richard A. Summers ("Summers Depo.")] at 29:14–30:12); San Bernardino agencies assign a "Cal I.D." number (Docket No. 169, Second Supp. Decl. of Donald W. Cook ("169 Cook Decl."), Ex. A [11/17/10 Deposition of Jim Nursall ("11/17/10 Nursall Depo.")] at 10:11–25); the CDOJ designates a California Identification Index ("CII") number (126 Cook Decl., Ex. G [Depo. of Johanna Williams ("Williams Depo.")] at 8:25–9:17); and the Federal Bureau of Investigation ("FBI") assigns its own separate identification number.

When an arrestee is booked in a California jail, the arrestee's fingerprints are recorded and transmitted to the CDOJ. (*See* 126 Cook Decl., Ex. E [Depo. of Dennis C. Cross ("Cross Depo.")] at 14:8–18; *accord id.*, Ex. K [Depo. of Cheryl Masse ("Masse Depo.")] at 7:15–19; Docket No.

136, Declaration of Della Thompson–Bell ("Thompson–Bell Decl."), Ex. 4 [Torrance Operations Manual] at COT000095.) If the individual's fingerprints are already on file, his various identification numbers and criminal history will be transmitted back to the arresting agency. (126 Cook Decl., Ex. E [Cross Depo.] at 15:10–20; *id.*, Ex. J [Summers Depo.] at 27:7:17.) If the arrestee's fingerprints are not on file, the CDOJ will assign a new CII number and notify the arresting agency that it has done so. (*Id.*, Ex. E [Cross Depo.] at 14:5–15:4.) A CII number can be used to generate an individual's criminal history and can be linked to that person's full name, aliases, birth date, residential addresses, and unique identifiers such as the person's social security number, driver's license number, and FBI number. (*Id.*, Ex. K [Masse Depo.] at 21:19–22:2.) In addition, law enforcement agencies have the ability to look up an individual's criminal history and identifying information by inputting his name and date of birth into a California Law Enforcement Telecommunication System ("CLETS") terminal.

## B. THE ARRESTS

### 1. JOSE ALEXANDER VENTURA

On December 13, 2007, Chino police officer Alex Courtney pulled Ventura over for a minor traffic violation. (*See* Docket No. 153, Declaration of Donald W. Cook ("153 Cook Decl."), Ex. G [Vehicle Report]; *accord* Docket No. 145, Chino Exhibits, Ex. B [Declaration of Alex Courtney ("Courtney Decl.")] ¶ 5.) During the stop, the officer ran a warrant check and discovered an outstanding Los Angeles County felony warrant for a "Jose Ventura," bearing Ventura's birth date. (Courtney Decl. ¶¶ 11–12.) The warrant identified the "Jose Ventura" as a 6'1" tall, 200–pound male Hispanic with the date of birth */*/1958 who resides in Los Angeles. (Chino Exhibits, Ex. J [Warrant Abstract].) The

warrant was issued on December 22, 1994, for controlled substances violations. (*Id.*) The warrant abstract does not contain a CII number, Social Security number, or any other unique identifiers. (*Id.*) Ventura's driver's license indicated he was 5'6" and 180 pounds (Courtney Decl. ¶ 13), but Ventura maintained he is actually 320 pounds. Officer Courtney, however, observed that Plaintiff Ventura appeared to be taller and heavier than indicated on his driver's license. (*See id.*) According to Courtney, Ventura "acknowledged" he was actually 5'11", but Ventura maintains that Courtney coached him to say so. (*Id.* ¶ 18; Docket No. 167, Opp. to Motions for Summary Judgment by Chino and San Bernardino Defendants ("Chino/SB Opp.") at 3.) Courtney states that, in his experience, it is common for there to be discrepancies between a person's actual height and weight and what is stated on a driver's license. (Courtney Decl. ¶ 22.) The Chino Communications Center then advised Courtney that the "Jose Ventura" warrant was active, and Courtney formed the opinion that the warrant was for Ventura. (*Id.* ¶ 19.) Courtney accordingly arrested Ventura. (*See id.* ¶ 21.)

Courtney took Ventura briefly to the Chino police station, where Ventura remained in the car. Courtney then transported Ventura to the San Bernardino County Jail, West Valley Detention Center ("WVDC"), where he remained for approximately four days. (*See* Docket No. 156, Declaration of Donald W. Cook ("156 Cook Decl."), ¶ 3A & Ex. B [Incident Report].) There, jail officials abstracted the warrant from Los Angeles County and booked Ventura. (*See* 126 Cook Decl., Ex. H [Warrant Abstract].) During booking, they took his fingerprints using Live Scan, a system that immediately transfers the prints to the CDOJ. (*See* Nursall Decl. ¶¶ 3, 7.)

On December 17, 2007, Ventura was transferred to the Los Angeles County Jail (126 Cook Decl., Ex. B [Ventura AJIS Record]), where he remained for two days until the Superior Court determined that he was not the proper subject of the warrant and accordingly released him. (*Id.,* Ex. A [Transcript of Proceedings] at 4:8–24.)

## 2. KELVIN GANT

Kelvin Gant has been arrested on warrants meant for his non-identical twin brother, Kevin Gant, "about five" times. (Thompson–Bell Decl., Ex. 1 [Deposition of Kelvin Gant ("Gant Depo.")] at 58:2–11.) This suit arises out of one such arrest on April 29, 2008.

Around 8 p.m. on the evening of April 29, 2008, Kelvin Gant was stopped by security at a shopping mall in Torrance for allegedly attempting to fraudulently refund a movie ticket. (*Id.,* Ex. 1 [Gant Depo.] at 68:11–12, 77:12–18, 82:10–19; *id.,* Ex. 2 [Short Form Arrest Report].) Mall security contacted the Torrance Police Department, and Officer Stephen Jangaard arrived at the scene and asked Gant some questions. (*Id.,* Ex. 2 [Short Form Arrest Report].) In his questioning, Jangaard determined that he had no cause to arrest Gant on the basis of his attempt to return the movie tickets. (Docket No. 163, Declaration of Donald W. Cook ("163 Cook Decl."), Ex. C [Deposition of Stephen Jangaard ("Jangaard Depo.")] at 17:8–21.) Officer Jangaard performed a routine warrant check, found an outstanding felony warrant purportedly in Gant's name, and looked at Gant's photo ID to confirm his identity. (Thompson–Bell Decl., Ex. 2 [Short Form Arrest Report].) The warrant named a "Kevin Thomas Gant," a black male, date of birth */*/1963, 5′4″ tall, 135 pounds, with black hair and brown eyes. (Docket No. 117, Declaration of Donald W. Cook ("117 Cook Decl."), Ex. A [Warrant Abstract].) The warrant identi-

fied the suspect's CII number as A06776321. (*Id.*) According to Gant, when Jangaard asked Gant for his social security number, Gant gave him his "judicial clearance papers," which showed that any warrant for "Kevin Gant," as opposed to Kelvin Gant, was not his. (Thompson–Bell Decl., Ex. 1 [Gant Depo.] at 58:12–15, 85:6–87:17.)

Jangaard then arrested Gant and transported him to the Torrance police station. (*Id.* at 89:20–91:14.) On the way to the station, Gant told Jangaard that the warrant was not his and asked to talk to a sergeant. (*Id.* at 92:14–93:6.) At the station, Watch Commander Lieutenant Irvine gave permission to book Gant and set bail, and Gant was booked, fingerprinted, and placed in a holding cell. (*Id.* 89:20–93:17, 96:23–24; *id.,* Ex. 3 at Torrance000012 [Booking Data Report].) The Torrance Police Department received a Live Scan report at 11:40 p.m. indicating that Gant's fingerprints corresponded to CII number A06572567, a different number from that listed on the warrant. (*Id.,* Ex. 3 at Torrance000014 [Live Scan Transaction Agency Notification].) That report also listed "Kevin Thomas Gant" and "Kevin T Gant" as aliases associated with Kelvin Gant's fingerprints. (*Id.*)

At his deposition, Gant testified that he was in the holding cell for "two, maybe three hours," and then the Torrance police let him go. (*Id.,* Ex. 1 [Gant Depo.] at 97:5–10.) Documentary evidence, however, suggests that Gant's recollection is mistaken, possibly because he has confused this incident with another time he was arrested on his brother's warrant. In L.A. County's Rule 26 initial disclosures, L.A. County provided Gant's counsel with an "Inmate Information Center" report indicating that Kelvin Gant was arrested on April 29, 2008, at 20:15 and not released until April 30, 2008, at 17:10. (117 Cook

Decl. ¶ 2 & Ex. E [Inmate Information Center Record] at 27, 29.) That report appears to indicate that Gant was transported from the Torrance Police Department to the L.A. County Court Services Division at 7:38 a.m. on April 30, 2008. (*Id.* ¶ 2 & Ex. E at 28; *id.*, Ex. F [Deposition of Angela Becerra ("Becerra Depo.")] at 104:9–16.)

On the afternoon of April 30, 2008, the prosecutor appeared in court and said that "the person in custody is not the defendant in this case." (*Id.*, Ex. G [Transcript of Proceedings] at 1.) The prosecutor further explained that the actual defendant had previously been picked up in another state, and the D.A.'s office declined to extradite him. (*Id.* at 1–2.) For that reason, and because "the wrong person is continually picked up on" the warrant, the prosecutor asked to have the case dismissed. (*Id.* at 2.) The Court granted the request. (*Id.*) The "Inmate Information Center" report indicates that Gant was released from custody at 5:10 p.m. (*Id.* ¶ 2 & Ex. E [Inmate Information Center Record] at 29.)

## III.

## ANALYSIS

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). Thus, when addressing a motion for summary judgment, the Court must decide whether there exists "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Id.* at 256, 106 S.Ct. 2505. The moving party can meet this burden by presenting evidence establishing the absence of a genuine issue or by "pointing out to the district court ... that there is an absence of evidence" supporting a fact for which the nonmoving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the nonmoving party must put forth "affirmative evidence" that shows "that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. This evidence must be admissible. *See* Fed.R.Civ.P. 56(c), (e). The nonmoving party cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the nonmoving party must show that evidence in the record could lead a rational trier of fact to find for it. *See id.* at 587, 106 S.Ct. 1348. In reviewing the record, the Court must believe the nonmoving party's evidence, and must draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

### B. SUBSTANTIVE LAW

Plaintiffs bring § 1983 claims based on Fourth and Fourteenth Amendment violations, Bane Act claims for unlawful arrest and imprisonment, and a claim for false imprisonment. At the outset, the Court outlines the law governing each of these claims.

#### 1. FOURTH AMENDMENT § 1983 CLAIMS

The Fourth Amendment protects individuals' right to be free from "unreasonable ... seizures." U.S. Const. Amend. IV. Arrests pursuant to a valid warrant are consistent with the Fourth Amendment. In addition, "when the police have probable cause to arrest one party,

and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill v. California*, 401 U.S. 797, 802, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) (internal quotations and alteration omitted). Thus, whether officers violated Plaintiffs' Fourth Amendment rights turns on whether they had reasonable cause to believe that Plaintiffs were the persons named in the warrants. *See id.*; *Blackwell v. Barton*, 34 F.3d 298, 303 (5th Cir. 1994).

### 2. FOURTEENTH AMENDMENT § 1983 CLAIMS

 The Fourteenth Amendment's Due Process Clause protects individuals against deprivations of liberty without due process of law. U.S. Const. Amend. XIV. This guarantees individuals the right to be free from incarceration absent a criminal conviction. *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir.2002). Before trial, an individual cannot be detained except upon a showing of probable cause either before or promptly after arrest. *Baker v. McCollan*, 443 U.S. 137, 142, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Ordinarily, arrest pursuant to a valid warrant meets this standard. *Id.* at 143, 99 S.Ct. 2689. Where an individual is mistakenly incarcerated, however, his loss of liberty can give rise to a due process claim "after the lapse of a certain amount of time." *Lee v. City of Los Angeles*, 250 F.3d 668, 683 (9th Cir.2001) (internal quotations omitted). At the point when detaining officials know or should know that the detainee is entitled to release, the detainee has a constitutional right to be free from continued detention. *Id.* In accordance with this standard, a public entity can be liable for failing to "institut[e] readily available procedures for decreasing the risk of erroneous detention." *Fairley*, 281 F.3d at 918.

 To determine whether the Due Process Clause requires a city to implement additional procedures for verifying that an arrestee is a warrant's true subject, the Court must apply the balancing test established in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See Fairley*, 281 F.3d at 918 & n. 6. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334, 96 S.Ct. 893 (internal alteration and quotations omitted). To identify what process is due, the Court considers "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335, 96 S.Ct. 893.

 This test applies to both arresting and non-arresting agencies that hold a detainee in custody. Contrary to the assertion of the L.A. County and San Bernardino Defendants, *Baker* does not establish that a "custodial agency is under no duty to investigate the arrestee's identity, even where the arrestee complains he is not the person wanted by the warrant, and even where the custodial agency has information in its possession that, if examined, would exonerate the arrestee." (Docket No. 120, L.A. Cnty. Defendants' Mem. at 6; *see also* Docket No. 140, San Bernardino Mem. at 15–16.) *Baker*, held only that in the situation presented in that case, detaining someone pursuant to a facially valid warrant for a period of three days, despite his protestations of innocence, did not violate due process. *Baker*, 443 U.S. at 144, 99 S.Ct. 2689. The Ninth Circuit

has subsequently construed *Baker* as establishing that " '[d]epending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of liberty ... without due process of law.' " *Lee*, 250 F.3d at 683 (quoting *Baker*, 443 U.S. at 145, 99 S.Ct. 2689); *accord Fairley*, 281 F.3d at 917–18. Although *Lee* and *Fairley* happened to involve the liability of an arresting agency, the court's reasoning did not turn on the custodians' roles in effecting the arrests. Rather, in Lee, the court held that the agency could be liable if it knew or should have known the detainee was entitled to release, *Lee*, 250 F.3d at 683, and in *Fairley*, the court held that the agency was liable because its procedures for verifying that the warrant matched the detainee in the face of his repeated protests failed the *Mathews* balancing test, *Fairley*, 281 F.3d at 918 & n. 6. In short, no case at any level has allowed a custodial agency to ignore the possibility that it may have the wrong person in custody.

### 3. MUNICIPAL LIABILITY FOR § 1983 CLAIMS

■■■■ A local government is liable under § 1983 only if a constitutional violation "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [entity's] officers." *Edgerly v. City & Cnty. of S.F.*, 599 F.3d 946, 960 (9th Cir. 2010) (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. 2018) (alteration in original). A local government entity will be liable "only where the entity's policies evince a 'deliberate indifference' to the constitutional right and are the 'moving force behind the constitutional violation.' " *Id.* (quoting *Levine v. City of Alameda*, 525 F.3d 903, 907 (9th Cir.2008)). A policy can be an official

policy or one made "by those whose edicts or acts may fairly be said to represent official policy." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900 (9th Cir.2008) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018). It can also be a "widespread practice that ... is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Gillette v. Delmore*, 979 F.2d 1342, 1348–49 (9th Cir. 1992) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)).

■■■■ Thus, to prevail on a § 1983 claim against a municipal defendant, a plaintiff must show (1) that he was "deprived of his constitutional rights by defendants and their employees acting under color of state law; (2) that the defendants have customs or policies which amount to deliberate indifference to ... constitutional rights; and (3) that these policies [were] the moving force behind the constitutional violations." *Lee v. City of Los Angeles*, 250 F.3d 668, 681–82 (9th Cir.2001) (internal quotations and alterations omitted). A municipal policy is the "moving force" behind a constitutional violation if it is the proximate cause of the constitutional injury. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir.1996).

### 4. BANE ACT CLAIMS

California Civil Code section 52.1, the Bane Act, allows an individual to sue a person who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]." Cal. Civ.Code § 52.1(a), (b). Government entities have respondeat superior liability for their employees' Bane Act violations. *See*

Cal. Gov't Code § 815.2; *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) ("California ... has rejected the *Monell* rule and imposes liability on counties under the doctrine of respondeat superior for acts of county employees."). In general, public entities are immune from liability where the employee would be immune from liability. Cal. Gov't Code § 815.2(b).

### 5. FALSE IMPRISONMENT

■ To make out a claim for the tort of false imprisonment, a plaintiff must show "(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 80 Cal.App.4th 485, 95 Cal. Rptr.2d 316, 323 (2000).

### C. APPLICATION

#### 1. CLAIMS BY VENTURA

The Court addresses in turn Ventura's claims against each of the three sets of defendants involved in his arrest and detention: the Chino Defendants, the San Bernardino Defendants, and the L.A. County Defendants.

#### a. Chino Defendants

Ventura brings § 1983 claims for violation of his Fourth and Fourteenth Amendment rights and a Bane Act claim for wrongful arrest against the Chino Defendants. Chino Defendants ask this Court to grant summary judgment on the ground that Ventura filed his opposition late. (Reply at 3.) The Court, however, must decide the motion on the merits. *See Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir.2003).

##### i. Fourth Amendment § 1983 Claim

To prevail on a § 1983 claim against the Chino Defendants, Ventura must show (1)

that he was "deprived of his constitutional rights by defendants and their employees acting under color of state law; (2) that the defendants have customs or policies which amount to deliberate indifference to ... constitutional rights; and (3) that these policies are the moving force behind the constitutional violations." *Lee*, 250 F.3d at 681–82 (internal quotations and alterations omitted).

##### (a) Deprivation of a Constitutional Right

■ Whether the arresting officers deprived Ventura of his Fourth Amendment rights turns on whether they had reasonable cause to believe that Ventura was the person named in the warrant. *See Blackwell*, 34 F.3d at 303. An officer's reasonable belief is generally a question of fact for a jury. *See Brinson v. Syas*, 735 F.Supp.2d 844, 854 (N.D.Ill.2010) (explaining that "whether the Officers reasonably believed that they were arresting the right person" presents a question of fact, "regardless of whether a valid arrest warrant exists").

Ventura contends that the arresting officer did not have reasonable cause to believe he was the subject of the warrant because (1) the height (6'1") and weight (200 lbs.) descriptors on the warrant did not match his height (5'6")[1] and weight (320 lbs.); (2) the warrant's subject lived in Los Angeles, while Ventura lived in Montclair; (3) the warrant's subject had a criminal history, while Ventura repeatedly told the officer he had none, and (4) as Chino's Rule 30(b)(6) agent admits, Chino did not "make a positive identification" of Ventura before arresting him. (SB/Chino Opp. at 6.) Although the discrepancy in residences, asserted lack of criminal history, and admission that Chino did not "make a positive identification" might not support a

---

1. Although the parties dispute Ventura's actual height, the Court is bound to construe the facts in the light most favorable to the non-moving party, Ventura, on a motion for summary judgment.

jury finding that the officer lacked reasonable cause to believe that Ventura was the warrant's subject, the discrepancy in weight and height could lead a reasonable jury to so conclude. To be sure, in some cases, courts have held as a matter of law that an officer had reasonable cause to believe an arrestee was the subject of a warrant where physical descriptors did not match. But in those cases, the discrepancies were less drastic than a 7–inch height and 120–pound weight difference. *See, e.g., Rodriguez v. United States,* 54 F.3d 41, 46 n. 4 (1st Cir.1995) (3–inch and 20–pound discrepancy); *Blackwell v. Barton,* 34 F.3d 298, 300 n. 1 (1–inch and 10–pound difference); *Martinez v. City of New York,* 340 Fed.Appx. 700 (2d Cir.2009) (2–inch and 20–pound discrepancy); *Brass v. Cnty. of L.A.,* 10 Fed.Appx. 412, 414 (9th Cir. 2001) (1–inch and 20–pound discrepancy). Whether Officer Courtney could have had a reasonable belief that Ventura was the warrant's subject, despite the height and weight discrepancies, is a question of fact for the jury. Thus, the Court cannot conclude as a matter of law whether Ventura suffered a deprivation of his Fourth Amendment rights.

### (b) Custom or Policy Amounting to Deliberate Indifference

 Chino's Rule 30(b)(6) agent testified that Ventura's arrest was "in accordance with the custom, policy, or practice" of the City of Chino and Chino Police Department. (Docket No. 166, Declaration of Donald W. Cook ("166 Cook Decl."), Ex. B [Deposition of Sgt. Kelliher ("Kelliher Depo.") ] at 109:15–21.) Based on this, a jury could conclude that this arrest was pursuant to an official policy. The question thus becomes whether a policy that would permit an arrest on a warrant issued for someone seven inches taller and 120 pounds lighter evinces a "deliberate indifference" to individuals' constitutional rights. *See Lee,* 250 F.3d at 681–82. A policy evinces deliberate indifference where "the need for more or different action is so obvious, and the inadequacy of the current procedure so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *Lee,* 250 F.3d at 682 (internal quotations and alteration omitted). This is generally a question for the jury. *Id.*

 Ventura, however, has not articulated precisely what Chino policy he challenges or why it amounts to deliberate indifference. Chino has submitted evidence that it has a written arrest policy that provides that "[w]arrant arrests will be made when the person has a confirmed, active warrant in the Wanted Persons System (WPS)." (Chino, Ex. A–1.) Although this policy contains no guidelines regarding how closely a suspect must match a warrant description to authorize an arrest, Ventura has put forth no evidence suggesting that this omission amounts to deliberate indifference. For example, Ventura presents no evidence that the policy has resulted in violations in the past or that it is likely to lead to future violations. It is not obvious that the policy's lack of guidelines regarding descriptors is inadequate; indeed, it is not even clear that such guidelines would be helpful. The Court therefore concludes that Ventura has not raised a triable issue of fact as to whether Chino has a policy evincing deliberate indifference to his constitutional rights. The Chino Defendants' motion for summary judgment as to Ventura's Fourth Amendment § 1983 claim is therefore **GRANTED.**

### ii. Fourteenth Amendment § 1983 Claim

 Ventura also claims a violation of his rights under the Fourteenth Amendment. Under the Fourteenth Amendment, a government actor can be liable for overdetaining a detainee. *See Lee,* 250 F.3d at

683. Chino did not detain Ventura beyond his arrest, however. The officer arrested him, stopped briefly at the Chino police department and left Ventura in the car, and then transported Ventura to the San Bernardino facility for booking. This claim must therefore be analyzed as an unreasonable arrest in violation of the Fourth Amendment, not as an over-detention in violation of the Fourteenth Amendment. Thus, to the extent that Ventura presses an independent Fourteenth Amendment § 1983 claim against the Chino Defendants, the Court **GRANTS** summary judgment to the Chino Defendants on that claim.

### iii. Bane Act Claim

■■■ To prevail on a claim under the Bane Act, a plaintiff must show that the defendant used "threats, intimidation, or coercion" to interfere with the plaintiff's state or federal constitutional rights. Cal. Civ.Code § 52.1(a), (b). As discussed above, there is a triable issue of fact as to whether Officer Courtney had reasonable cause to believe that Ventura was the subject of the warrant, and thus whether Ventura suffered a Fourth Amendment violation. The Court, however, concludes that the Chino Defendants are entitled to summary judgment on this claim because there is no evidence that an officer used "threats, intimidation, or coercion" in violating Ventura's rights.

As Judge Snyder recently explained in *Reyes v. City of Glendale,* there is a split in the case law on whether a false arrest or imprisonment, without more, satisfies the "coercion" element of a section 52.1 claim. *Reyes v. City of Glendale,* No. 05–0253, 2009 WL 2241602, *19–*21 (C.D.Cal. July 23, 2009). On the one hand, Magistrate Judge Chen has held that the "[u]se of law enforcement authority to effectuate a stop [and] detention ... can constitute interference by threat, intimidation, or coercion if the officer lacks probable cause." *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dep't,* 387 F.Supp.2d 1084, 1103 (N.D.Cal.2005) (internal quotations and alteration omitted). Thus, in that case, Magistrate Judge Chen allowed a plaintiff to proceed on a section 52.1 claim for unreasonable seizure "even though there was no claim that the police used excessive physical force in carrying [it] out." *Id.* On the other hand, Magistrate Judge James held in a different context that "section 52.1 is only applicable when a defendant intends by his or her conduct to interfere with a separate, affirmative right enjoyed by a plaintiff; it does not apply to a plaintiff's allegation of use of excessive force absent a showing that the act was done to interfere with a separate state or federal constitutional right." *Justin v. City & Cnty. of S.F.,* No. 05–4812, 2008 WL 1990819, *9 (N.D.Cal. May 5, 2008) (holding that plaintiff could not pursue section 52.1 claim on the basis of allegations that Defendants used force to interfere with his right to be free from bodily restraint or harm). In *Reyes,* Judge Snyder followed Magistrate Judge Chen's approach in *Cole. Reyes,* 2009 WL 2241602, at *21.

No on-point California authority addresses this issue. Magistrate Judge Chen's and Magistrate Judge James' orders each relied on California Supreme Court decisions that did not confront the question whether a separate showing of coercion, apart from the coercion inherent in a search and detention, was necessary to state a section 52.1 claim. Magistrate Judge Chen relied primarily on *Venegas v. County of Los Angeles,* which allowed plaintiffs to proceed on a section 52.1 claim for unreasonable search and seizure where they alleged that officers had stopped the couple's car for lack of license plates, got the wife to consent to a search of the home, and then arrested the husband for violation of parole and detained the wife for two hours without charging her. *Vene-*

*gas v. Cnty. of L.A.*, 32 Cal.4th 820, 11 Cal.Rptr.3d 692, 87 P.3d 1, 3–4, 14 (2004). There, however, the court considered only whether section 52.1 applied to actions taken without discriminatory animus, and did not explicitly consider whether section 52.1 required a showing of coercion independent from the coercion inherent in the constitutional violation. *Id.*, 11 Cal. Rptr.3d 692, 87 P.3d at 13–14. Magistrate Judge James relied primarily on the California Supreme Court's decision in *Jones v. Kmart Corp.*, which likewise did not address the issue here. In *Jones*, the court stated that a section 52.1 plaintiff must show "an attempted or completed act of interference with a legal right, accompanied by a form of coercion," and refused to allow the plaintiff to proceed on a claim based on an unreasonable search and seizure. *Jones v. Kmart Corp.*, 17 Cal.4th 329, 70 Cal.Rptr.2d 844, 949 P.2d 941, 944 (1998). The court, however, did not hold that a plaintiff could never proceed on a section 52.1 claim based on a mere unreasonable search and seizure. Rather, the court held only that that plaintiff could not bring his section 52.1 claim against Kmart because the Fourth Amendment did not apply to Kmart, a private party. *Id.*, 70 Cal.Rptr.2d 844, 949 P.2d at 942, 944.

Given the lack of California case law on the key issue in this case, the Court looks to Massachusetts case law for guidance. Because section 52.1 is modeled on the Massachusetts Civil Rights Act of 1979, decisions construing the Massachusetts statute are instructive in interpreting section 52.1. *Cole*, 387 F.Supp.2d at 1103. Massachusetts case law suggests that the statute's coercion element is not met merely because the constitutional violation itself is inherently coercive. In *Longval v. Commissioner of Correction*, the Massachusetts Supreme Court considered a prisoner's claim under the corresponding state civil rights law that his rights were violated when he was unlawfully transferred to an administrative segregation unit in another prison without a hearing. *Longval v. Comm'r of Corr.*, 404 Mass. 325, 535 N.E.2d 588, 590 (1989). There, the court held that "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act." *Id.* at 593. Thus, it held, "we see no coercion, within the meaning of the State Civil Rights Act, simply from the use of force by prison officials, authorized to use force, in order to compel a prisoner to do something he would not willingly do, even if it turns out that the official had no lawful right to compel the prisoner to take that action." *Id.* Because the use of force was intrinsic to the alleged violation itself, it did not also satisfy the additional "force" or "coercion" element of the statute.

In *Cole*, Magistrate Judge Chen reasoned that another Massachusetts case suggested otherwise. *Cole*, 387 F.Supp.2d at 1104. In particular, Magistrate Judge Chen cited a Massachusetts case holding that intimidation or coercion was present where a private security officer ordered a candidate to stop distributing handbills and soliciting signatures on private property. *Id.* (citing *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 473 N.E.2d 1128 (1985)). A later case explained this holding as showing that "an implicit threat of physical ejection or arrest" amounts to coercion for purposes of the statute. *Id.* (citing *Bally v. Northeastern Univ.*, 403 Mass. 713, 532 N.E.2d 49, 53 (1989)). In that case, however, the coercive threat of arrest interfered with the exercise of an independent right to solicit signatures. *Batchelder*, 473 N.E.2d at 1129. This case therefore does not show that a threat of arrest—or arrest—satisfies the statute's "coercion" element where the arrest itself is the constitutional violation.

█ In light of this authority, the Court concludes that a wrongful arrest and

detention, without more, cannot constitute "force, intimidation, or coercion" for purposes of section 52.1. Ventura has put forth no evidence that the Chino Defendants used any force, intimidation, or coercion in accomplishing his allegedly unlawful arrest. The Court therefore **GRANTS** summary judgment to the Chino Defendants on Ventura's section 52.1 claim.

#### b. San Bernardino Defendants

Ventura also brings § 1983 claims for violation of his Fourth and Fourteenth Amendment rights and a Bane Act claim for wrongful arrest against the San Bernardino Defendants. In his opposition to the San Bernardino Defendants' motion for summary judgment and at the hearing, Ventura also pressed a state-law false imprisonment claim. Ventura's operative complaint, however, does not assert a false imprisonment cause of action against the San Bernardino Defendants. (*See* TACC at 17–24.) Ventura therefore cannot go forward with that claim.

##### i. Fourth Amendment § 1983 Claim

■ San Bernardino Defendants played no part in the arrest of Ventura. Ventura contends that these defendants can nonetheless be held liable under the Fourth Amendment for his unlawful arrest and the following unlawful pre-arraignment incarceration. (SB/Chino Opp. at 5.) In support of this assertion, Ventura cites three cases, none of which establish that a non-arresting official—or the entity employing that official—can be liable for an unreasonable arrest under the Fourth Amendment. *West v. Cabell* establishes only that arresting someone on a warrant that describes someone else violates the Fourth Amendment. *West v. Cabell*, 153 U.S. 78, 86–87, 14 S.Ct. 752, 38 L.Ed. 643 (1894). *Pierce v. Multnomah County, Or-*

*egon* establishes only that the Fourth Amendment applies to evaluate the conditions of custody of an "arrestee detained *without a warrant* up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest." *Pierce v. Multnomah Cnty., Ore.*, 76 F.3d 1032, 1043 (9th Cir.1996) (emphasis added). And *Patton v. Przybylski* discusses the liability of an arresting officer. *Patton v. Przybylski*, 822 F.2d 697, 699 (7th Cir.1987). Because Ventura has not offered any authority establishing that non-arresting defendants can be liable for an arrest in violation of the Fourth Amendment, the Court **GRANTS** summary judgment to the San Bernardino Defendants on Ventura's Fourth Amendment § 1983 claim.

##### ii. Fourteenth Amendment § 1983 Claim

To prevail on a § 1983 claim against the San Bernardino Defendants for a violation of his Fourteenth Amendment due process rights, Ventura must show (1) that he was "deprived of his [Fourteenth Amendment] rights by defendants and their employees acting under color of state law; (2) that the defendants have customs or policies which amount to deliberate indifference to … constitutional rights; and (3) that these policies are the moving force behind the constitutional violations." *Lee*, 250 F.3d at 681–82 (internal quotations and alterations omitted).

To make out a deprivation of a Fourteenth Amendment right—as required for the first element for municipal liability—Ventura must show that San Bernardino officials knew or should have known that he was not the true subject of the warrant.[2] Ventura claims that officials should have known because readily available pro-

---

2. The San Bernardino Defendants contend that it is not enough that officials "should have known" he was not the true subject of

the warrant. (San Bernardino Mem. at 5.) Rather, they contend, Ventura must show that an officer was deliberately indifferent, that is,

cedures would have revealed he was not the warrant's subject. (SB/Chino Opp. at 12.) In particular, Ventura first contends that San Bernardino could have run his name and date of birth through the California Law Enforcement Telecommunication System ("CLETS") terminal to match him to his criminal history. (*Id.*) This, he contends, could have revealed that he was not the subject of the warrant in two ways: (1) a search would have revealed another "Jose Ventura" with a criminal history corresponding to the warrant, and (2) a search would show that his CLETS entry did not contain an arrest associated with the warrant. Second, Ventura contends that San Bernardino officials could have used the County's CAL–ID unit to quickly obtain the fingerprints of the warrant's subject and compare them to Ventura's. (SB/Chino Opp. at 12.) To show that he suffered a constitutional deprivation under any of these theories, Ventura must show (1) that the Due Process Clause requires these additional procedures under the *Mathews v. Eldridge* balancing test, and (2) that employing these procedures would have in fact revealed that he was not the Jose Ventura named in the warrant. The Court addresses in turn each of the additional procedures that Ventura urges were required.

### (a) CLETS Search

In support of his contention that a CLETS search could have easily confirmed that he was not the warrant's subject, Ventura explains that an officer can enter a name and birthdate into CLETS and obtain all people who match or closely match those identifiers. (126 Cook Decl.,

Ex. G [Williams Depo.] at 21:14–22.) Each person will have an associated CII number. (*Id.* 22:9–11.) The officer can then use the CII number to obtain the criminal history information for each person listed. (*Id.* 22:18–22.) The officers could then examine this criminal history to determine if the detainee or another person has a criminal history that corresponds to the warrant.

The Court will not decide here whether, under the *Mathews* balancing test, due process requires officers to perform such searches, because Ventura cannot establish that employing these procedures in his case would have revealed that he was not the warrant's true subject. Because following the procedures would not have revealed the error, Ventura cannot show that officials should have known he was entitled to release. Without that showing, Ventura cannot establish that he suffered a deprivation of his Fourteenth Amendment rights.

To be sure, running a CLETS search of Ventura's name and birth date would not have revealed any criminal history. The information in the CLETS database associated with Ventura's CII number includes only an application to a foster family agency and the erroneous arrest underlying this suit. (126 Cook Decl., Ex. F [Live Scan Results for Ventura].) Ventura's lack of criminal history alone, however, would not confirm that Ventura was not the subject of the warrant. Brenda Walstrom, a Sheriff's Custody Specialist for San Bernardino County, explained in a declaration that warrant charges do not necessarily result from a custodial arrest

that an officer actually knew that Ventura was not the warrant's subject but ignored that information. (*Id.*) This misapprehends the Fourteenth Amendment standard. If an official should have known that Ventura was not the true subject but failed to release him, the official has violated Ventura's rights. *See Lee,* 250 F.3d at 683. A showing of deliberate

indifference is required only to establish *municipal* liability. To establish such liability, Ventura need not show that an official was deliberately indifferent, but rather that the entity has "customs or policies which amount to deliberate indifference to ... constitutional rights." *Id.* at 681–82.

that would have resulted in fingerprinting and a corresponding criminal history entry in CLETS. (Declaration of Brenda Walstrom ("Walstrom Decl."), Attachment to San Bernardino Mem., ¶ 6.) Further, she attested, "[i]t is not possible to train Sheriff's personnel concerning, and they are not qualified to determine, all of the circumstances under which warrant charges might not show up on a detainee's criminal history." (*Id.*) Ventura offers no evidence to refute this. Thus, Ventura's lack of a criminal history in CLETS would not put the officials on notice that Ventura was not the warrant's true subject.

Ventura also contends that a CLETS search would have confirmed he had been wrongfully arrested because it would have shown another "Jose Ventura" with a criminal history corresponding to the warrant. He provides no evidence for this, however. Instead, he cites deposition testimony about a different wrongfully arrested person, and testimony about how CLETS works generally. (*See* Docket No. 127, Plaintiff's SGI, Plaintiff's Facts 8 and 9.) Indeed, the deposition testimony of Johanna Williams, custodian of records for the CDOJ, establishes that running a CLETS search with the name "Jose Ventura" and Ventura's birth date yields only one exact match: Ventura himself. (Docket No. 186, Excerpts of Williams Depo., at 53:2–8.) Her testimony also establishes that that search yields a list of three Jose Venturas without matching birth dates. (*Id.* at 36:8–15; *see also id.*, Ex. A [Declaration of Johanna Williams ("Williams Decl.") ], ¶¶ 8–9 & Attachment.) However, none of these three matches corresponds to the actual warrant subject, who has the same birth date as Ventura.

Williams' search also indicated "[t]otal subjects greater than 12" and "[t]otal names in age range (166)." (*Id.* at 36:17–

24; *see also id.*, Ex. A [Williams Decl.], ¶¶ 8–9 & Attachment.) There is no evidence that the true warrant subject is within the 166 "names in age range," however. Ventura therefore has not produced evidence that could meet his burden to show that performing a CLETS search would have revealed he was not the true subject of the warrant. Thus, he cannot make out a Fourteenth Amendment claim on the basis of the Defendants' failure to perform such a search.

#### (b) CAL–ID Fingerprint Match

Ventura also contends that San Bernardino officials could have verified his identity by obtaining the fingerprints of the warrant's subject and comparing them to his. (SB/Chino Opp. at 12.) Ventura contends that officers should have obtained the warrant subject's fingerprint-based unique identifiers by running the name "Jose Ventura" and the relevant birth date through CLETS and reviewing the hits to locate the one associated with the criminal case from which the warrant issued. Although San Bernardino Supervising Fingerprint Examiner Jim Nursall testified that confirmation through this process would be "possible," he did not testify that this would have worked in Ventura's particular case. (*See* 169 Cook Decl., Ex. A [11/17/10 Nursall Depo.] at 34:21–37:24.) Indeed, as explained above, there is no evidence that a CLETS search would in fact have yielded a result corresponding to the true subject. Ventura therefore has not produced sufficient evidence that performing a CLETS search to get the true subject's fingerprints would have revealed he was wrongfully arrested.

San Bernardino officers could have gotten the true subject's fingerprints and compared them to Ventura's in a more simple way, however: they could have asked the warranting agency for them.[3]

---

**3.** In their Statement of Undisputed Facts, San Bernardino Defendants assert that "even if

On December 19, 2007, Ventura was ultimately released from custody after a Los Angeles Police Department representative brought the fingerprints of the warrant subject to court and concluded they did not match Ventura's. (126 Cook Decl., Ex. A [Transcript of Proceedings] at 3:17–24, 4:8–24.) This shows that the prints were readily available. The failure to do a fingerprint comparison may well have violated Ventura's Fourteenth Amendment rights. Under *Fairley*, it violates due process to fail to do a fingerprint comparison where a detainee protests he is not the subject of the warrant on which he is incarcerated. *See Fairley*, 281 F.3d at 915, 918. Here, Ventura has raised a triable issue of fact as to whether he made complaints that would have triggered the San Bernardino Defendant's obligation to do a fingerprint comparison. San Bernardino Defendants contend that Ventura never complained, pointing to Walstrom's declaration that Ventura had received details about filing grievances and complaints but his booking jacket did not contain any written grievances or complaints, even though a booking jacket would typically contain such documents. (Walstrom Decl., Attachment to San Bernardino Mem., ¶ 13.) Ventura, however, testified that he did inform two San Bernardino officers that he was not the subject of the warrant. (166 Cook Decl., Ex. D [Depo. of Alexander Ventura ("Ventura Depo.")] at 167:2–168:22.) Whether Ventura alerted the San Bernardino officers that he was the wrong guy is thus a disputed issue of fact. The resolution of this fact question will determine whether San Bernardino officers' failure to compare Ventura's fingerprints to those of the warrant's true subject violated Ventura's Fourteenth Amendment rights.

■■■■ Nonetheless, Ventura can prevail on his Fourteenth Amendment claim against the San Bernardino Defendants only if he can show not only that he suffered a constitutional deprivation, but also that that deprivation resulted from an unconstitutional municipal custom or policy that was the moving force behind the constitutional violation. *See Lee*, 250 F.3d at 681–82 (internal quotations and alterations omitted). Ventura has not offered any evidence that the failure to obtain fingerprints from the warranting agency was pursuant to an official policy or practice, as required for the entity-defendants to be liable. Indeed, the San Bernardino Defendants have offered the declaration of a Sheriff's Custody Specialist that San Bernardino has a policy requiring such a fingerprint comparison when a detainee complains that he is not the subject of a warrant. (Walstrom Decl., Attachment to San Bernardino Mem. ¶¶ 4, 6–7.) Ventura does not refute this evidence, nor does he offer any evidence that, in practice, San Bernardino does not follow this policy. He therefore cannot make out a *Monell* claim against the San Bernardino Defendants. The Court accordingly **GRANTS** summary judgment to the San Bernardino Defendants on Ventura's Fourteenth Amendment § 1983 claim.

### iii. Bane Act Claim

To prevail on a claim under the Bane Act, a plaintiff must show that the defen-

---

phone calls had been made to Los Angeles County Sheriff's Department to request further information such as a CII number or fingerprints for the subject of [the warrant] to compare to Ventura's information, none would have been available." (Docket No. 141, San Bernardino's SUF ¶ 27.) The evidence they cite in support of this, however,

establishes only that the booking jacket that LASD received from San Bernardino did not contain the warrant subject's fingerprints or other identifying information, not that LASD did not otherwise have the prints. (Docket No. 121, Declaration of Angela Becerra ("Becerra Decl.") ¶¶ 32–34.)

dant used "threats, intimidation, or coercion" to interfere with the plaintiff's state or federal constitutional rights. Cal. Civ. Code § 52.1(a), (b). Here, Ventura has raised a triable issue of fact as to whether the San Bernardino Defendants violated his Fourteenth Amendment rights by failing to compare his fingerprints to those of the warrant's subject. Under California law, the entity defendants can be liable for this failure, even if it was not pursuant to an official policy. *See* Cal. Gov't Code § 815.2; *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir.2002) ("California ... has rejected the *Monell* rule and imposes liability on counties under the doctrine of respondeat superior for acts of county employees."). However, Ventura has not put forth evidence of "threats, intimidation, or coercion" necessary for a Bane Act claim. For the reasons explained above, the Court concludes that section 52.1 requires a showing of coercion independent from the coercion inherent in a wrongful detention itself. Because Ventura has not offered any evidence of such independent coercion, the Court **GRANTS** summary judgment to the San Bernardino Defendants on Ventura's Bane Act claim.

### c. L.A. County Defendants

Finally, Ventura brings a § 1983 claim against the L.A. County Defendants for violation of his Fourteenth Amendment rights.

### i. Fourteenth Amendment § 1983 Claim

■ Ventura has failed to present evidence showing that the L.A. County Defendants deprived him of any constitutional right, the threshold element necessary to make out a claim for municipal liability. To establish that L.A. County officials deprived him of his Fourteenth Amendment rights, Ventura must establish that those officials detained him even though they knew or should have known that he was entitled to release. *See Lee*, 250 F.3d at 683. *Fairley* makes clear that a custodial agency is required to employ "readily available procedures" to verify a detainee's identity if that detainee makes "protests of innocence." *Fairley*, 281 F.3d 913. Here, there is no evidence from which a reasonable jury could conclude that Ventura complained to any L.A. County official that he was not the subject of the warrant. When asked whether he had complained to anyone while at the L.A. County Jail, Ventura responded that he "decided not to say anything because anyway I would be ignored." (Docket No. 121, Decl. of Scott E. Caron ("Caron Decl."), Ex. A [Ventura Depo.] at 151:15–18.) When asked, "So you made no complaints to anybody at the Los Angeles County Jail; correct?" he answered, "Not to anyone." (*Id.* at 19–21.) Ventura's counsel attempts to overcome this testimony by pointing to Ventura's deposition testimony that he told a woman at the fingerprint window in the L.A. County jail that "I think they're confused about me. I'm not the person you're looking for." (Docket No. 129, Declaration of Donald W. Cook ("129 Cook Decl."), Ex. A [Ventura Depo.] at 172:7–10.) Standing alone, this might be enough to raise a triable issue of fact as to whether Ventura complained to anyone such that County officials would have had a duty to verify his identity. In light of his unequivocal statement that he complained "[n]ot to anyone," however, no reasonable jury could conclude that his statement to the woman at the fingerprinting window amounted to a protest that he was not the person named in the warrant. Ventura therefore cannot establish a Fourteenth Amendment violation under the law as established in *Fairley*.

■ Ventura contends, however, that the Fourteenth Amendment also requires an agency that receives custody of a detainee from another agency to indepen-

dently verify, as a matter of course, that the detainee is the person named in the warrant on which he was arrested, even if the detainee does not complain. The Court does not agree that the Fourteenth Amendment requires such procedures, at least absent special circumstances. First, Ventura has not cited, and the Court has not found, any authority suggesting that a custodial agency has such a duty to independently verify all detainees' identities as a matter of course.

Second, application of the *Mathews v. Eldridge* balancing test shows that due process does not require a custodial agency to confirm a detainee's identity where the detainee does not complain that he has been wrongfully incarcerated. Under the *Mathews* test, to determine what process is due, the Court must consider, "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893. The private interest at stake—a potential deprivation of liberty through incarceration—is plainly significant. *See Fairley*, 281 F.3d at 918 (noting the importance of the liberty interest in remaining free from incarceration). Where a detainee does not complain, however, the risk of erroneous deprivation and the probable value of additional procedural safeguards are slight. One can reasonably assume that, absent special circumstances, mistakenly incarcerated individuals will generally make it known. Thus, the risk that a non-complaining detainee will be wrongfully detained is relatively small, and verifying such detainees' identities is unlikely to uncover many mistakenly arrest-

ed people. On the other side of the balance, the burden on a custodial agency to independently verify for *every* detainee that the arresting agency properly determined that the detainee was the subject of a warrant is great, particularly in comparison to the risk of erroneous deprivation. LASD processes hundreds of inmates into the jail every day, and on some days processes up to a thousand. (Docket No. 114–1, Declaration of Angela Becerra ("Becerra Decl.") ¶ 14.) Balancing these factors under the *Mathews* test, the Court concludes that the Due Process Clause does not require custodial agencies to independently verify the identity of non-complaining detainees.

This conclusion is consistent with the cases recognizing that an over-detention following an arrest on a facially valid warrant violates the Fourteenth Amendment, which generally involve detainees who complained they were not the subjects of the warrants on which they were detained. *See Baker*, 443 U.S. at 145, 99 S.Ct. 2689; *Fairley*, 281 F.3d at 918; *Alvarado v. Bratton*, 299 Fed.Appx. 740, 743 (9th Cir. 2008). In Lee, there is no indication the detainee complained, but there were special circumstances: the detainee's mental incapacity was "obvious," and the detaining agency was the arresting agency, which did not attempt to verify his identity at all. *Lee*, 250 F.3d at 684. Such special circumstances are not present here.

Because Ventura has put forth no evidence that he complained about his mistaken identity to any L.A. County official, he cannot establish that the L.A. County Defendants violated his Fourteenth Amendment right against over-detention. The Court accordingly **GRANTS** summary judgment to the L.A. County Defendants on Ventura's Fourteenth Amendment § 1983 claim.

## 2. CLAIMS BY GANT

The Court addresses in turn Gant's claims against the Torrance Defendants and the L.A. County Defendants.

### a. *Torrance Defendants*

Gant brings a § 1983 claim for violation of his Fourth and Fourteenth Amendment[4] rights against the Torrance City Defendants and the individual Torrance Defendants, and Bane Act and false imprisonment claims against the Torrance City Defendants. Torrance Defendants ask this Court to grant summary judgment on the grounds that Ventura did not timely file an opposition memorandum or Separate Statement of Genuine Issues of Material Fact. (Torrance Reply at 2–3.) The Court, however, must decide the motion on the merits. *See Martinez*, 323 F.3d at 1182.

### i. Fourth Amendment § 1983 Claim

Gant asserts his Fourth Amendment claim against Jangaard, Irvine, and the Torrance City Defendants. The Court addresses in turn each defendant's potential liability.

#### (1) *Jangaard*

 A public official sued in his individual capacity, like Jangaard, is entitled to summary judgment if he is entitled to qualified immunity. An official is entitled to qualified immunity where his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Under *Pearson v. Callahan*, a court may grant qualified immunity if "the facts that a plaintiff has alleged or shown [do not] make out a violation of a constitutional right" or if "the right at issue was

[not] 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 816, 818, 172 L.Ed.2d 565 (2009). A defendant is also entitled to qualified immunity if he made a reasonable mistake of law or fact. *See Motley v. Parks*, 383 F.3d 1058, 1072 (9th Cir.2004).

 Gant contends that Officer Jangaard violated his Fourth Amendment rights at two points: first, by making the initial investigatory stop, and second, by arresting him on the warrant. As to the first alleged violation, an investigatory stop does not violate the Fourth Amendment if the officer has "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The undisputed facts show that Jangaard had such articulable suspicion at the time he initially stopped Gant for questioning. Gant himself admitted that Jangaard questioned him only after mall security notified the Torrance police that Gant was suspected of fraudulently trying to return movie tickets. Gant's claim that Jangaard violated his Fourth Amendment rights by stopping him for questioning therefore fails as a matter of law.

 As to the second alleged violation, whether Officer Jangaard deprived Gant of his Fourth Amendment rights by arresting him on the warrant for Kevin Gant turns on whether there was reasonable cause to believe that Gant was the person named in the warrant. *See Blackwell*, 34 F.3d at 303. An officer's reasonable belief is generally a question of fact for a jury. *See*

---

**4.** The applicable § 1983 claim in the operative complaint states only that the Torrance Defendants violated Gant's rights "as secured by the Fourth Amendment." (TACC ¶ 80.)

However, this claim alleges "wrongful imprisonment," which in substance states a Fourteenth Amendment claim. The Court analyzes it accordingly.

*Brinson,* 735 F.Supp.2d at 854 (explaining that "whether the Officers reasonably believed that they were arresting the right person" presents a question of fact, "regardless of whether a valid arrest warrant exists"); *accord Kennedy v. L.A. Police Dept.,* 901 F.2d 702, 706 (9th Cir.1989) (whether a reasonable officer could have believed his actions lawful "is a question for the trier of fact"). Here, whether Jangaard reasonably believed that Gant was the person named in the warrant presents a question of fact for the jury. Gant very closely matched the descriptors in the warrant: same birth date, race, sex, approximate height and weight, and a name off by only one letter. However, Gant testified that he showed Jangaard a "judicial clearance" form indicating he was not the subject of the warrant. (Thompson–Bell Decl., Ex. 1 [Gant Depo.] at 58:12–15, 85:6–87:17.) This testimony raises a triable issue of fact as to whether Officer Jangaard reasonably believed that Gant was the subject of the warrant.

 Even if Officer Jangaard violated Gant's Fourth Amendment rights by arresting him on the warrant, however, Gant's right was not clearly established under the facts of this case. To be sure, it is clearly established that an officer cannot arrest someone on a warrant obviously meant for someone else. *See Hill,* 401 U.S. at 802, 91 S.Ct. 1106. But rights are not clearly established for qualified immunity purposes at this level of generality. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Rather, rights are clearly established only if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. 3034. Thus, an official is entitled to qualified immunity unless, "in light of pre-existing law," the unlawfulness of his actions are "apparent." *Id.* No case law clearly establishes that, in circumstances like

those here, where an arrestee produces judicial clearance papers indicating he is not the subject of a warrant, an officer could not reasonably believe that person to be the subject of the warrant. Moreover, circuit law teaches that "[t]he test for qualified immunity is whether any reasonable officer would make the constitutional error in question, not whether a reasonable person would." *Fogel v. Collins,* 531 F.3d 824, 834 (9th Cir.2008) (emphasis in original). Thus, an officer can be held personally liable only if "at the time of the incident, all reasonable officers would have concluded" that his actions were unlawful. *Id.* (emphasis added). Here, the Court cannot conclude that "all reasonable officers would have concluded" that there was no reasonable basis to believe that Gant was the person named in the warrant. For these reasons, Jangaard is entitled to qualified immunity. The Court accordingly **GRANTS** summary judgment to Jangaard on Gant's Fourth Amendment § 1983 claim.

### (2) Irvine

██ Lieutenant Irvine was not present at Gant's arrest. Rather, he only approved him for booking. (Thompson–Bell Decl., Ex. 3 at Torrance000012 [Booking Data Report].) Because Irvine played no part in Gant's arrest, he cannot be liable under the Fourth Amendment for unlawfully arresting him. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."). The Court accordingly **GRANTS** summary judgment to Irvine on Gant's Fourth Amendment § 1983 claim.

### (3) Torrance City Defendants

To prevail on a § 1983 claim against a municipal defendant, a plaintiff must show (1) that he was "deprived of his constitu-

tional rights by defendants and their employees acting under color of state law; (2) that the defendants have customs or policies which amount to deliberate indifference to ... constitutional rights; and (3) that these policies are the moving force behind the constitutional violations." *Lee,* 250 F.3d at 681–82 (internal quotations and alterations omitted).

First, as discussed above, whether Gant suffered a deprivation of his constitutional rights turns on whether the arresting officer had reasonable cause to believe that Gant was the person named in the warrant. In the circumstances here, this is a question for the jury.

■ Gant argues that the Torrance City Defendants can be liable for this violation because they admit that the arrest was in accordance with official policy. (*See* 163 Cook Decl., Ex. D [Responses to Requests for Admissions] at ¶ 5.) Gant, however, makes no argument that this policy amounts to "deliberate indifference" to constitutional rights. Indeed, he does not even specify what policy, or lack of policy, led to his unlawful arrest, as opposed to his unlawful detention. Because Gant makes no attempt to explain the basis for the Torrance City Defendants' liability under the Fourth Amendment, and offers no evidence that those Defendants maintain a policy evincing deliberate indifference to constitutional rights, the Court **GRANTS** summary judgment to the Torrance City Defendants on Gant's Fourth Amendment § 1983 claim.

### ii. Fourteenth Amendment § 1983 Claim

Gant also asserts a Fourteenth Amendment claim against Jangaard, Irvine, and the Torrance City Defendants. The Court first addresses whether Gant suffered a Fourteenth Amendment violation at all, and then addresses each defendant's potential liability for that violation.

■ Under *Lee,* at the point when detaining officials know or should know that a detainee is entitled to release, the detainee has a constitutional right to be free from continued detention. *Lee,* 250 F.3d at 683. At 11:40 p.m. on April 29, 2008, Torrance officials received a transmittal back from the Live Scan fingerprinting system that indicated that Gant's fingerprint-based CII number did not match the CII number for the suspect named on the warrant. (Thompson–Bell Decl., Ex. 2 [Live Scan Transaction Agency Notification].) This transmittal gave the officials actual knowledge that Gant was not the person named in the warrant. The Torrance Defendants disagree, emphasizing that the criminal history record associated with the CII number on the warrant named a "Kelvin Thomas Gant." This argument misses the mark. Although the warrant subject may have used the name "Kelvin Thomas Gant," the warrant's subject demonstrably did not have Gant's fingerprints. The Torrance officials accordingly knew that Gant was not the warrant's subject unless they can put forth evidence that they had reason to believe that the CII number on the warrant was unreliable. They have put forth no such evidence. Because Torrance officials had information showing that Gant was not the true subject of the warrant, they violated his Fourteenth Amendment rights by continuing to detain him.

Because Torrance defendants had this conclusive proof that Gant was not the warrant's subject, it does not matter that Gant may not have protested his mistaken identity to anyone but Jangaard. Further, given this conclusive proof, the short duration of the detention does not mean that Gant suffered no unconstitutional deprivation of liberty. In *Baker,* the Supreme Court held that a three-day detention following an arrest on a facially valid warrant

could not amount to a constitutional violation. *Baker*, 443 U.S. at 144–45, 99 S.Ct. 2689. In that case, however, the detaining agency did not have *actual* knowledge that the defendant was not the true subject of the warrant. And, in any event, the Ninth Circuit has declined to read *Baker* as creating a bright line rule that detentions shorter than three days do not amount to Fourteenth Amendment violations. *See Alvarado*, 299 Fed.Appx. at 742. For these reasons, the Court concludes that, because Torrance officials had actual knowledge that Gant was not the subject of the warrant, they violated his Fourteenth Amendment rights by continuing to detain him overnight.

### (1) Jangaard and Irvine

■ Despite the constitutional violation, the Court **GRANTS** summary judgment to Jangaard and Irvine on Gant's Fourteenth Amendment claim. Individual officers can be liable under § 1983 only where they personally participate in a deprivation of a constitutional right. *Taylor*, 880 F.2d at 1045. Gant has put forth no evidence that either Jangaard or Irvine continued to detain him after his misidentification as the warrant subject was confirmed. Because there is no evidence that they participated in his continued detention, they cannot be liable.

### (2) Torrance City Defendants

To prevail on a § 1983 claim against a municipal defendant, a plaintiff must show (1) that he was "deprived of his constitutional rights by defendants and their employees acting under color of state law; (2) that the defendants have customs or policies which amount to deliberate indifference to ... constitutional rights; and (3) that these policies are the moving force behind the constitutional violations." *Lee*, 250 F.3d at 681–82 (internal quotations and alterations omitted).

■ For the reasons set forth above, the failure to release Gant immediately upon confirming he was not the true subject of the warrant violated his Fourteenth Amendment rights. In addition, Torrance Defendants have admitted that the detention of Gant was in accordance with and pursuant to official policy. (*See* 163 Cook Decl., Ex. D [Responses to Requests for Admissions] at ¶ 2.) A policy under which wrongfully arrested detainees are not immediately released was the "moving force" behind the violation of Gant's Fourteenth Amendment right. Thus, the only question that remains is whether this policy amounts to "deliberate indifference to ... constitutional rights." *See Lee*, 250 F.3d at 681–82. Whether a municipal policy evinces deliberate indifference is generally a jury question. *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir.2002). Where a "municipal actor disregarded a known or obvious consequence of his action," a jury can infer that a municipality made a "deliberate or conscious choice to countenance the possibility of a constitutional violation." *Id.* at 1194 (internal quotations omitted). On its face, a policy that allows for the continued detention of a person proven not to be the subject of the warrant on which he was arrested presents the obvious risk that a person would be unjustifiably detained. From this, a jury could infer deliberate indifference. The Court accordingly **DENIES** summary judgment to the Torrance City Defendants on Gant's Fourteenth Amendment § 1983 claim.

### iii. Bane Act Claim

Gant also asserts a Bane Act claim against the Torrance City Defendants. To prevail on a claim under the Bane Act, a plaintiff must show that the defendant used "threats, intimidation, or coercion" to interfere with the plaintiff's state or federal constitutional rights. Cal. Civ.Code § 52.1(a), (b). Although Gant has raised a

triable issue of fact as to whether the Torrance City Defendants violated his Fourth and Fourteenth Amendment rights by arresting him and by detaining him after confirming he was not the subject of the warrant, he has not put forth evidence of additional "threats, intimidation, or coercion" necessary for a Bane Act claim. For the reasons explained above, the Court concludes that section 52.1 requires a showing of coercion independent from the coercion inherent in a wrongful arrest or detention itself. Because Gant has not offered any evidence of such independent coercion, the Court **GRANTS** summary judgment to the Torrance City Defendants on Gant's Bane Act claim.

### iv. False Imprisonment Claim

Gant next asserts a claim for false imprisonment against the Torrance City Defendants. "The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton,* 95 Cal.Rptr.2d at 323. Under California law, a jailer can be liable for false imprisonment "if he knew or should have known of the illegality of the imprisonment." *Sullivan v. Cnty. of L.A.,* 12 Cal.3d 710, 117 Cal.Rptr. 241, 527 P.2d 865, 869 (1974). Municipal defendants can be derivatively liable based on the acts of their employees. *Id.*

For the reasons set forth above, the evidence shows that Torrance officials continued to detain Gant after they knew or should have known that he was not the subject of the warrant, and thus that his detention was unlawful. The Torrance City Defendants contend that they are nonetheless entitled to summary judgment on Gant's false imprisonment claim because they are immune under California Civil Code section 43.55 and California Penal Code section 825(a) and because Gant's release was not unreasonably delayed.

(Torrance Mem. at 18–19.) The Court addresses each contention in turn.

California Civil Code section 43.55 provides that a "peace officer who makes an arrest pursuant to a warrant of arrest regular upon its face" shall not be liable "if the peace officer in making the arrest acts without malice and in the reasonable belief that the person arrested is the one referred to in the warrant." Cal. Civ.Code § 43.55(a). As explained above, there is a material question of fact as to whether, given the judicial clearance form, Officer Jangaard had a reasonable belief that Gant was the warrant's subject. The Torrance City Defendants are therefore not immune from liability under section 43.55. Moreover, even if they were immune from liability for the arrest, this provision would not immunize them from liability for conduct *after* the arrest, namely the continued detention of Gant after receiving the Live Scan results.

California Penal Code section 825 likewise does not immunize the Torrance City Defendants from liability for false imprisonment. Section 825 provides that a "defendant shall in all cases be taken before the magistrate without unnecessary delay, and, in any event, within 48 hours after his or her arrest, excluding Sundays and holidays." Cal.Penal Code § 825(a). On its face, this section does not immunize anyone from liability. Moreover, Defendants cannot plausibly contend that, under this section, all arrests and detentions are lawful—no matter what the basis—so long as the detainee is brought before a magistrate within 48 hours. Their claim for immunity under Penal Code section 825(a) therefore fails.

Finally, Torrance City Defendants claim, without citation to any authority, that Gant's "time in custody is also not unreasonable as a matter of law because both Plaintiff and his twin are each associated with two different CII numbers." (Tor-

rance Mem. at 19.) In other words, because the name "Kelvin Gant" appeared under both Kelvin's and his twin's CII number, it was reasonable to hold him overnight to determine whether Kelvin Gant was the subject of the warrant. This does not follow. A CII number is based on an individual's fingerprints and thus is unique to him. The officials knew that Gant's fingerprints did not match the fingerprints of the suspect named in the warrant, and the Torrance City Defendants have offered no evidence that they had a reasonable belief that the warrant was actually intended for someone with a different CII number. The Torrance City Defendants' argument therefore fails. The Court accordingly **DENIES** summary judgment to the Torrance City Defendants on Gant's false imprisonment claim.

### b. L.A. County Defendants

Finally, Gant asserts a single § 1983 claim against the L.A. County Defendants for violation of his Fourteenth Amendment rights. To prevail on a § 1983 claim against a municipal defendant, a plaintiff must show (1) that he was "deprived of his constitutional rights by defendants and their employees acting under color of state law; (2) that the defendants have customs or policies which amount to deliberate indifference to ... constitutional rights; and (3) that these policies are the moving force behind the constitutional violations." *Lee,* 250 F.3d at 681–82 (internal quotations and alterations omitted). The Court **GRANTS** summary judgment to the L.A. County Defendants on this claim because Gant has not put forth any evidence establishing that L.A. County Defendants or their employees violated his constitutional rights.

As an initial matter, L.A. County Defendants contend that they are entitled to summary judgment because Gant has not put forth any evidence that he was ever even in L.A. County custody at all. (Docket No. 112, L.A. Mem. at 3.) The Court disagrees. In support of their argument, L.A. County Defendants point to Gant's deposition testimony that he remained in a holding cell at the Torrance Police Department for "two, maybe three hours," and then the Torrance police let him go. (Thompson–Bell Decl., Ex. 1 [Gant Depo.] at 97:5–10.) L.A. County Defendants, however, put forth no affirmative evidence—such as a declaration from a custodian of records—that Gant was *not* in L.A. County custody. Moreover, documentary evidence suggests that he *was* in their custody, and that Gant's deposition testimony was mistaken. An "Inmate Information Center" report that L.A. County provided in its initial Rule 26 disclosures indicates that Kelvin Gant was arrested on April 29, 2008, at 20:15 and not released until April 30, 2008, at 17:10. (117 Cook Decl. ¶ 2 & Ex. E [Inmate Information Center Record] at 27, 29.) That report also indicates that Gant was transported from the Torrance Police Department to facility "CSD," module "CRTT" at 7:38 a.m. on April 30, 2008. (*Id.* at 28.) Deposition testimony of Angela Becerra, a document control sergeant at the inmate reception center of the Los Angeles County Sheriff's Department, indicates that "CSD" stands for "court services division" and "CRTT" stands for "court transportation area."[5] (*Id.,* Ex. F at 5:19–6:1, 104:9–16.) Thus, there is evidence that Gant was in L.A. County custody.[6]

---

**5.** This deposition testimony was given in connection with another case, and thus Becerra did not have Gant's record in front of her. Nonetheless, the Court can reasonably assume that the abbreviations are also valid for Gant's Inmate Information Center record.

**6.** L.A. County Defendants object to this evidence as hearsay. (Docket No. 172, Reply at 2.) Public records, however, are excepted from the hearsay rule. Fed.R.Evid. 803(8). Although Plaintiff's counsel has done a poor job authenticating this evidence and establish-

Nonetheless, the evidence indicating that Gant was in L.A. County custody shows that he was in their custody for the sole purpose of appearing in court. The record shows that he arrived at the court services division at 7:38 a.m. (*Id.,* Ex. E.) His case was called during the afternoon session, and he was released at 5:10 p.m. (*Id.,* Exs. E, G.) Gant cites no authority indicating that a custodial agency that briefly holds a detainee while he awaits a court appearance that same day can be liable for over-detention in violation of the Fourteenth Amendment. The Court concludes that, when a detainee is in custody for the purpose of a court hearing at which a judge will determine whether the detainee should remain in custody, that non-arresting custodial agency cannot be liable for over-detention as a matter of law. The agency is holding the detainee for the sole purpose of providing him process that will determine his entitlement to release. So long as the court hearing is prompt—as it unquestionably was here—that custodial agency has no independent duty to confirm, before the court does, that the detainee is properly in custody. The Court accordingly **GRANTS** summary judgment to the L.A. County Defendants on Gant's Fourteenth Amendment § 1983 claim.

### IV.

### CONCLUSION

For the reasons set forth above, the Court **GRANTS** summary judgment in favor of the Chino Defendants, San Bernardino Defendants and L.A. County Defendants on all of Ventura's claims. The Court **GRANTS** summary judgment to Jangaard, Irvine, and the L.A. County Defendants on all of Gant's claims. The Court also **GRANTS** summary judgment to the Torrance City Defendants on Gant's Fourth Amendment § 1983 claim and Gant's Bane Act claim. The Court, however, **DENIES** summary judgment to the Torrance City Defendants on Gant's Fourteenth Amendment § 1983 claim and false imprisonment claim.

**IT IS SO ORDERED.**

---

ing its status as a public record, the Court can presume it falls within this exception. On its face, the record appears to be a public agency record setting forth "the activities of the office," namely the detention of inmates. *See* Fed.R.Evid. 803(8). Further, L.A. County provided the Inmate Information Center record in its initial disclosures, suggesting that it was an L.A. County record.